IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TITA CAMILOTES, *et al*., individually, and on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | No. 10 C 366 |
| RESURRECTION HEALTH CARE CORPORATION, *et al.*, | Honorable Amy J. St. Eve |
| Defendants. | |

## DEFENDANTS' RESPONSE TO
## PLAINTIFFS' MOTION FOR A PROTECTIVE ORDER

By their motion, Plaintiffs ask the court to take the extraordinary step of prohibiting Defendants from communicating with their staff nurses about this lawsuit during work hours and compelling Defendants to produce signed declarations they have obtained from staff nurses. Plaintiffs' motion should be denied in its entirety.

As the United States Supreme Court and Seventh Circuit have made clear, parties have a right to interview unrepresented employees and obtain declarations from them regarding factual allegations in a case such as this. Courts should not interfere with this right unless the moving party establishes a clear record of coercion, intimidation or efforts to dissuade participation in the lawsuit. Plaintiffs offer no such evidence. Nor could they.

As demonstrated below, Defendants took great care to ensure that the nurses' rights were protected before and after the interviews. The interviews were conducted by non-lawyers, without participation of human resources or management, and only after the nurses had been

apprised of their rights and provided the opportunity to opt out of the interview. Moreover, each nurse was also advised that signing the declaration was entirely voluntary, and there is no record that anybody coerced any nurse into signing their declaration.

The only evidence that Plaintiffs offer to support their motion is the subjective and self-serving claim of two opt-in plaintiffs that they were pressured into signing declarations. But, as Plaintiffs admit, one freely chose not to sign her declaration. The facts show that although these nurses were mistakenly asked to sign a declaration, they were not coerced or intimidated into doing so – nor was anyone else.

Plaintiffs' motion also fails to provide any legal or factual basis for requiring Defendants to waive their work product privilege by compelling the production of the other nurse declarations. Indeed, Plaintiffs' counsel has asserted the same privilege with respect to declarations they have obtained from nurses. The declarations are indisputably attorney work product and Plaintiffs fail to show a substantial need for them.

## I.      BACKGROUND

### A.      Plaintiffs' Lawsuit

Named Plaintiffs are or were non-exempt staff nurses at one of the Defendant hospitals. They allege that Defendants violated the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), the Illinois Minimum Wage Law, 820 ILCS § 105/1 *et seq.* ("IMWL"), and the Illinois Wage Payment and Collection Act, 820 ILCS 115/1, *et seq.* ("IWPCA"), by failing to pay them all earned overtime wages and compensate them for all time worked. Plaintiffs also assert an Illinois common law unjust enrichment claim. Plaintiffs seek to bring their FLSA claim as a collective action under 29 U.S.C. § 216(b) and their IMWL, IWPCA and unjust enrichment claims as a Rule 23 class action. Plaintiffs' sole claim is that they and the nurses whom they

- 2-

seek to represent were not paid when they worked during their unpaid meal break. (First Am. Consol. Compl. ¶¶ 1, 3, 34.)

On September 13, 2010, this Court conditionally certified the FLSA class and authorized Plaintiffs to mail a notice to join this lawsuit to other hourly nurses employed by Defendants. (Docket No. 74.) Notice was sent to 5,029 nurses. (Affidavit of Ann-Marie Woods ("Woods Aff.") ¶ 4.)[1] By the conclusion of the opt-in period, only 303 of the 5,029 nurses chose to join the FLSA class. Subsequently, 86 of the 303 opt-in plaintiffs were voluntarily dismissed or withdrew from the lawsuit, leaving an FLSA class of just 217. (Docket Nos. 125-26, 133, 135, 137-39, 155, 161.) No motion seeking Rule 23 certification has been filed.

### B. Defendants' Investigation of Plaintiffs' Claim

During this litigation, three Vedder Price Project Assistants conducted nurse interviews at the various Defendant hospitals to investigate the allegations in Plaintiffs' Complaint. The nurses were interviewed separately by a single Project Assistant, each in her early to mid 20s when the interviews were conducted. No lawyer or representative from management or human resources was present during the interviews. (Woods Aff. ¶¶ 2-3, 5, 7; Yoo Aff. ¶¶ 2-5; Hekhuis Aff. ¶¶ 2-5.)

Defendants sought to interview only nurses who had not opted into the FLSA class and were not otherwise represented by Plaintiffs' or other counsel. Prior to each nurse interview, the Project Assistants read a preliminary statement that:

- Identified the Project Assistant and her employment with Vedder Price;

- Explained that Vedder Price represented the hospital in a lawsuit filed by nurses claiming they were not paid all wages owed;

---

[1] Attached as Exhibit A. Affidavit of Sarah Yoo ("Yoo Aff.") is attached as Exhibit B and Affidavit of Jennifer Hekhuis ("Hekhuis Aff.") is attached as Exhibit C.

- Explained that the nurses who filed the case are seeking to bring their claims on behalf of all nurses who worked at the hospitals, including the interviewee;

- Asked whether the interviewee had been contacted by any lawyer regarding the case and, if so, whether he/she is represented by a lawyer;

- Explained that the interviewee had no obligation to speak with the Project Assistant and his/her participation was completely voluntary;

- Explained that the interviewee could terminate the interview at any time;

- Affirmed that the interviewee's job would not be affected, positively or negatively, by his/her choice to speak or not speak with the Project Assistant, and that the hospital would not provide any benefits or take any action based on the interviewee's choice to participate or not participate in the interview; and

- Asked whether the interviewee understood the preliminary statement; whether he/she had any questions; whether he/she was willing to proceed with the interview.

The preliminary statement also directed the Project Assistant to end the interview immediately if the nurse indicated he or she was represented by counsel. The Project Assistant would not proceed with the interview unless the nurse affirmatively represented that she was comfortable proceeding. (Woods Aff. ¶¶ 5, 8, Ex. 1; Yoo Aff. ¶¶ 4, 6, Ex. 1; Hekhuis Aff. ¶¶ 4, 6, Ex. 1.)

After hearing the preliminary statement, only one nurse declined to be interviewed and the Project Assistant immediately terminated the interview. (Yoo Aff. ¶ 7.) No nurse said he or she was represented by counsel. For each nurse who agreed to be interviewed, the Project Assistant asked at the end of the interview whether the individual would be willing to sign a declaration memorializing the conversation. (Woods Aff. ¶¶ 9-10; Yoo Aff. ¶¶ 8-9; Hekhuis Aff. ¶¶ 7-8.) Two nurses stated that they would not be willing to sign a declaration and they were not asked to sign a declaration again. (Woods Aff. ¶ 10; Yoo Aff. ¶ 9.)

After completing the interviews and before Plaintiffs filed their motion, Defendants obtained declarations from 45 nurses (excluding Evangaline Biglang-Awa) at five Defendant hospitals – Saints Mary and Elizabeth Medical Center ("SMEMC"), West Suburban Medical

- 4 -

Center ("WSMC"), Our Lady of the Resurrection Medical Center ("OLR"), Resurrection

Medical Center ("RMC") and St Francis Hospital ("St. Francis). (Woods Aff. ¶ 12.)[2]

The declarations were obtained in the following manner:

- SMEMC – HR Assistant Michael Starks telephoned nurses and requested that they come to the hospital HR office to review their declaration. For each nurse who came to the HR office, Starks: (i) handed them the declaration; (ii) reminded them that the declaration related to a meeting they had with the hospital's attorney; (iii) asked them to review the declaration; (iv) asked them to sign the declaration if they agreed with what was in it; and (v) told them to talk with the HR Director if they did not agree with the contents, wanted to make changes or had questions. Three nurses never signed their declarations because they never returned Starks' call or never came to the HR office. Starks did not contact these three nurses again. (Affidavit of Michael Starks ¶¶ 6-10 (attached as Exhibit D).)

- WSMC – The HR Director instructed the nurses to review their declaration and to sign it if they approved of its contents. Nurses were given as much time as they needed to review the declarations and were told to make any changes they wanted. The declarations were signed one to two months after the interviews. (Affidavit of Nancy Gunnell ¶¶ 4-6 (attached as Exhibit E); Woods Aff. ¶ 15.)

- OLR – An HR Specialist handed the nurses their declarations and told them: (i) to review the declarations; (ii) they were under no obligation to sign them; (iii) they could take their time reviewing the declarations; and (iv) to sign the declarations only if they felt comfortable doing so. The declarations were signed approximately four months after the interviews. (Affidavit of Mardel Ahleong ¶¶ 5-6 (attached as Exhibit F); Woods Aff. ¶ 15.)

- RMC – The HR Director or one of two HR Specialists individually asked the nurses to review their declarations for accuracy. Nurses were told to ask questions if they had any. Nurses had the opportunity to review their declaration for as long as they needed and the HR Director or HR Specialist was available to answer any questions. When nurses wanted to edit the declarations, they were told to do so. One nurse said she was not comfortable signing the declaration and she was told she did not have to sign it. The declarations were signed approximately one month after the interviews. (Affidavit of Aletha Ottlinger ¶¶ 5-8 (attached as Exhibit G); Woods Aff. ¶ 15.)

- St. Francis – An HR Specialist asked the nurses to review their declarations and made sure the nurses were comfortable with what was written. Nurses were free to ask questions and nurses did. If a nurse wanted to make changes, he or she was

---

[2] Defendants have obtained additional declarations after the motion was filed and are supplementing their privilege log accordingly. (Woods Aff. ¶ 18.)

told to do so.  When one nurse said she did not want to sign the declaration, she was told that she did not have to sign it.  The declarations were signed one to two months after the interviews.  (Affidavit of Janice Lindquist ¶¶ 5-6; Affidavit of Peggy Kasper ¶¶ 6-8 (both attached as Exhibit H); Woods Aff. ¶ 15.)

In total, seven nurses declined to sign their declarations, including one from SMEMC (excluding Irma Brito and Kiersten Sullivan).  Twenty-five nurses made changes to their declarations prior to signing, including five from SMEMC.  (Woods Aff. ¶¶ 16-17.)  No nurse at any hospital was told that (i) he or she was required to sign the declaration; (ii) he or she could not make changes to the declaration; (iii) his or her employment would be affected if the nurse did not sign the declaration; or (iv) he or she only had a limited amount of time to sign the declaration.  (Affidavit of Sara Piekielny ("Piekielny Aff.") ¶¶ 7-8 (attached as Exhibit I); Starks Aff. ¶¶ 8-9; Gunnell Aff. ¶¶ 5-7; Ahleong Aff. ¶¶ 6-7; Ottlinger Aff. ¶¶ 5, 7, 9; Lindquist Aff. ¶¶5, 7; Kasper Aff. ¶¶ 6, 9.)

### C. Three Opt-In Plaintiffs Were Inadvertently Contacted by Defendants

Prior to them joining the FLSA class, Defendants interviewed SMEMC nurses Irma Brito, Evangeline Biglang-Awa and Kiersten Sullivan.  (Pls. Mtn. 2.)  Defendants later inadvertently asked all three to sign a declaration after each had opted-in to the lawsuit.  Biglang-Awa signed her declaration; Brito and Sullivan did not.  Brito was asked to review her declaration, she left it in the Human Resources Manager's office with a note stating "I was in HR to sign my Declaration and wanted to discuss it with you before I sign it."  She was not asked again to sign the declaration.  (Piekielny Aff. ¶¶ 9, Ex. 1.)

As soon as Defendants' counsel learned of the oversight, they immediately contacted Plaintiffs' counsel to explain what happened.  Defendants' counsel subsequently informed Plaintiffs' counsel that Defendants would not use Biglang-Awa's declaration and provided a copy of the declaration to Plaintiffs' counsel.  (Pls. Mtn. pp. 2, 7 n.5.)

- 6 -

## II.    ARGUMENT

### A.    Plaintiffs Have Not Carried Their Burden of Showing A Clear Record of Coercion

Each party in a class action has a right to communicate with putative class members.[3] *EEOC v. Mitsubishi Motor Mfg. of Am., Inc.*, 102 F.3d 869, 870 (7th Cir. 1996). Judicial intervention limiting this right is justified *only* when the moving party establishes that there is a "*a clear record* and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 (1981) (emphasis added); *see also Williams v. Chartwell Financial Servs., Ltd.*, 204 F.3d 748, 759 (7th Cir. 2000). The moving party must show that a particular form of communication is abusive and threatens the proper functioning of the litigation. *Jones v. Nat'l Counsel of Young Men's Christian Ass'n*, No. 09-cv-6437, 2011 WL 1312162, at *6 (N.D. Ill. March 31, 2011) (citing *Gulf Oil*, 452 U.S. at 102).[4] Abusive communication includes "misleading communication and communications which affect a putative class members' [sic] decision to participate in the class." *Wiginton v. C.B. Richard Ellis*, No. 02-cv-6832, 2003 WL 22232907, at *2 (N.D. Ill. Sept. 16, 2003). However, the mere possibility of abuse does not justify court intervention. *Gulf Oil*, 452 U.S. at 104.

Here, Plaintiffs cannot meet their burden of establishing a clear record that Defendants coerced or misled putative class members during the interview and/or declaration review processes. Quite the opposite is true. Defendants went to great lengths to ensure that no nurse felt that he or she was required to cooperate with Defendants by talking to the Project Assistants

---

[3] To be clear, Defendants do not want to communicate with any nurse in the FLSA class about this lawsuit nor will they make any attempt to do so. Defendants only wish to communicate with their employees who are not in the FLSA class (i.e., not represented by counsel).

[4] Cited authorities not published in the West National Reporter System are attached as Exhibit J in the order in which they appear.

or signing a declaration. Appropriate pre-interview disclosures were given, and no manager or HR person was present during the interviews. Defendants even took the extra precaution of having Project Assistants, not attorneys, conduct the interviews. When obtaining declarations, Defendants made sure the nurses: reviewed the declaration; knew they had the opportunity to make revisions; knew to sign the declaration only if they agreed with its contents; and voluntarily signed the declaration. Defendants had HR personnel, not a nurse's supervisor, oversee the declaration review process. Given these extensive precautions, Plaintiffs cannot in good faith argue that Defendants have threatened the Rule 23 class or FLSA collective action process by engaging in misleading communications or attempting to influence putative class members not to participate in the class action. Significantly, other than the nurses interviewed from SMEMC, all other interviews were conducted after the FLSA opt-in period had closed. (Woods Aff. ¶ 6.) Thus, there could be no interference with the FLSA class process.

Courts in analogous situations have upheld the employer's right to conduct employee interviews and obtain declarations, even when it was attorneys who conducted the interviews and obtained declarations. *See Jones*, 2011 WL 1312162, at *6 (attorney could continue employee interviews and obtaining declarations because defendants "implemented methods to attempt to diminish the potential for coerciveness" by reading a preliminary statement at the beginning of the interview); *Ross v. Wolf Fire Protection*, 799 F. Supp. 2d 518, 521, 526-27 (D. Md. 2011) (no restriction imposed on attorney communications despite not informing employees when talking with them that the lawsuit filed could include them). *See also Pruitt v. City of Chicago*, No. 03-cv-2877, 2004 WL 1146110, at *2 (N.D. Ill. May 20, 2004) (employer's conduct in gathering declarations proper even without evidence that employer provided declarants any notice to ensure they understood their rights); *McLaughlin v. Liberty Mut. Ins.*, 224 F.R.D. 295,

- 8 -

298-99 (D. Mass. 2004) (same); *Basco v. Wal-Mart Stores*, No. Civ.A. 00-3184, 2002 WL 272384, at *4 (E.D. La. Feb, 25, 2002) (same).[5]

Plaintiffs nevertheless make the grandiose statement based on the declarations of *only two* nurses from *only one of the eight* Defendant hospitals (i.e., SMEMC) that "staff nurses felt pressured" into signing the declarations. (Pls. Mtn. p. 9.) Notably, Plaintiffs evidently were unable to get a similar declaration from Kiersten Sullivan, the third opt-in nurse Defendants inadvertently asked to sign a declaration, who remains an opt-in class member.

Plaintiffs cannot demonstrate that any communications Defendants had with Brito and Biglang-Awa affected the class or collective action process or their participation in the lawsuit. Both are still opt-in class members. While it is not clear what communications, if any, made them feel pressured, their subjective feelings that they were pressured into signing declarations is insufficient to establish a "clear record" of misleading or coercive action warranting a broad order limiting Defendants' communication with its employees. *See Zwerin v. 533 Short North, LLC*, No. 2:10-cv-488, 2011 WL 2446622, at *3 (S.D. Ohio June 15, 2011) (despite defendant knowingly contacting a represented plaintiff and asking him to retract his declaration, court refused to issue a "blanket" protective order because there was no evidence that the other declarations "were obtained or influenced by either coercion or misrepresentations."); *Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042, 1047 (N.D. Ill. 2003) (affidavit from an employee asserting that her employer was trying to coerce her into dismissing her lawsuit against the company "does not alone create the clear record and specific findings" needed to restrict

---

[5] Plaintiffs seem to suggest that employer communications with putative class members are inherently coercive, and so should be "monitored." (Pls. Mtn. p. 8.) Not surprisingly, courts have found otherwise. *See Jones*, 2011 WL 1312162, at *6 ("Although an at-will employee-employer relationship can produce a potential for coercion, the existence of an employee-employer relationship alone is not enough to justify restricting Defendants communications.")

- 9-

employer-employee communications); *Snide v. Discount Drug Mart, Inc.*, No. 1:11-cv-0244, 2011 WL 5434016, at *9-10 (N.D. Ohio Oct. 7, 2011) (affidavit stating that attorney told employee that her interview was a "survey" and did not mention the lawsuit was insufficient to establish a clear record of coercion).

Furthermore, while Brito and Biglang-Awa contend they subjectively felt pressured to sign their declarations, the evidence is to the contrary. Brito never signed her declaration. Additionally, SMEMC HR Assistant Michael Starks never told the two nurses: (i) that they were required to sign the declaration; (ii) that their employment would be affected in any way if they did not sign the declaration; or (iii) that they had a limited amount of time to review and sign the declaration. Instead, Starks told the nurses to review the declaration and speak with the HR Director if they wanted to make changes or had questions. And Brito did just that – she left a note with the HR Director requesting to speak with her about her declaration. (Starks Aff. ¶¶ 8-9; Piekielny Aff. ¶ 9.) Starks' declaration and Brito's own conduct thus fail to establish a clear record that Defendants misled or coerced these two nurses, let alone misled or coerced other declarant nurses. *See Wiginton*, 2003 WL 22232907, at *3 (based on conflicting testimony, the court did "not find that the record supports a clear finding of actual or threatened abuses.").

In fact, the record shows that the 10 nurse declarants at SMEMC and 35 nurse declarants at the four other hospitals did not feel pressured to participate in the interviews or sign their declarations. (*See*, *supra*, pp. 3-6; Pls. Mtn. Ex. E.) Nurses were never told they were required to sign the declaration or that their employment would be affected in any way if they did not sign it. Instead, nurses were told to review the declaration and sign it only if they felt comfortable with its contents. Nurses were given as much time as they needed to review the declaration, and given the opportunity to make changes to the declaration. Indeed, 25 nurses made changes to

- 10-

their declarations before signing them and 7 nurses declined to sign them. (Woods Aff. ¶¶ 16-17.)

The cases Plaintiffs cite are inapposite. (Pls. Mtn. p. 9.) In *Ojeda-Sanchez v. Bland Farms*, which is vastly different from this case, a Georgia employer sent an individual to Mexico to visit with three known named plaintiffs and asked them to state in writing that they were not involved in the lawsuit. 600 F. Supp. 2d 1373, 1376-77 (S.D. Ga. 2009). The plaintiffs felt they had to "distance themselves from the litigation" because the employer told them that: they would not be rehired if they participated in the litigation; proceeding with the lawsuit would be futile; and/or plaintiffs' counsel "could steal one's identity and never return to help." *Id.* at 1379. The court also specifically noted that the plaintiffs were itinerant employees who needed more protection. *Id.* at 1381. No threats were made here and the 45 nurse declarants are not party plaintiffs or itinerant employees. Similarly inapposite is *Mevoarh v. Wells Fargo Home Mortgage, Inc.*, where the defendants improperly characterized the lawsuit while conducting interviews. No. 05-1175, 2005 U.S. Dist. LEXIS 28615, at *13-14 (N.D. Cal. Nov. 15, 2005).[6]

Quite simply, Plaintiffs' evidence does not come close to establishing the clear record needed to restrict Defendants' right to communicate with their employees. Accordingly, Plaintiffs motion to restrict Defendants' speech should be denied.[7]

---

[6] Plaintiffs cannot support their coercion argument with allegations that nurses were not informed of the declaration's significance before signing it and felt compelled to sign inaccurate declarations. (*See* Pls. Mtn. pp. 9-10.) Neither allegation satisfies Plaintiffs' burden of demonstrating a clear record of coercion. As explained above, Defendants took great care during the interviews and when obtaining declarations not to coerce nurses or compel them to sign inaccurate declarations; and there is no requirement to inform a declarant of the significance of the declaration. *See*, *supra*, pp. 3-6.

[7] Plaintiffs characterization that they have made a "narrow" request to only restrict Defendants from communicating with staff nurses about this lawsuit on the hospitals' premises and during work hours is a red herring. (Pls. Mtn. p. 9.) This restriction would effectively preclude

(cont'd)

**B.**     **Defendants Should Not Be Required to Produce the Declarations or the Declarants' Telephone Numbers and Addresses**

Plaintiffs' request that the Court compel Defendants to produce the signed declarations they have obtained and provide the declarants' contact information so they can investigate what declarants were told about the declarations and whether the declarations are accurate.  (Pls. Mtn. pp. 9-11.)  Plaintiffs' arguments miss the point and show they are engaged in nothing more than a fishing expedition.  Regardless of what was said to the nurses or what is in the declarations, Defendants need not produce the declarations or contact information because they are attorney work product, and Plaintiffs show no substantial need for them.

**1.**     **The Declarations Are Protected Attorney-Work Product**

Plaintiffs' counsel apparently agrees that the nurse declarations are protected attorney work product because counsel has asserted the same protection with respect to declarations they have obtained.  *See* Plaintiffs' First Supplemental Privilege Log 1-11, 17 (attached as Exhibit K).  To qualify as work product, material must be: (1) documents and tangible or intangible things; (2) prepared in anticipation of litigation or trial; and (3) prepared by or for another party or that other party's representative.  8 C.A. Wright, A.R. Miller & R.L. Marcus, *Federal Practice and Procedure* § 2024, at 494-497 (3d ed. 2010) ("Wright & Miller").  Here, the declarations sought by Plaintiffs are work product.  They were created in preparation for litigation by two Project Assistants at the direction of counsel and summarize the Project Assistants' understanding of the witnesses' statements.  (Woods Aff. ¶ 11; Yoo Aff. ¶ 10.)[8]  Courts, including the Supreme Court

---

(cont'd)

Defendants from communicating with their unrepresented employees about the lawsuit.  No court has found such a restriction reasonable, especially when there is no clear record of coercion to support any restriction at all.

[8] That Project Assistants interviewed and helped draft the declarations is not relevant to whether the documents are protected attorney work product.  *See BASF Aktiengesellschaft v. Reilly*

(cont'd)

and Seventh Circuit, have routinely found that these types of sworn witness statements from non-party individuals prepared by counsel or counsel's representative are work product.  *See, e.g.*, *Hickman v. Taylor*, 329 U.S. 495, 510 (1947); *Corley v. Rosewood Care Ctr.*, 142 F.3d 1041, 1052-53 and 1053 n.11 (7th Cir. 1998); *Makowski v. SmithAmundsen*, *LLC*, No. 08-cv-6912, 2010 WL 3184483, at *4 (N.D. Ill. Aug. 11, 2010); *1100 West, LLC v. Red Spot Paint and Varnish Co., Inc.*, No. 05-cv-1670, 2007 WL 2904073, at *2 (S.D. Ind. May 18, 2007); *In re Convergent Technologies Second Half 1984 Sec. Litig.*, 122 F.R.D. 555, 558 (N.D. Cal. 1988). *See also* 8 Wright & Miller, *Federal Practice and Procedure* § 2028, at 582 (the federal rules of civil procedure "create[] no right in a party to the litigation to obtain a copy of a statement of an ordinary witness without the usual showing" of substantial need and undue hardship.)

### 2.    Plaintiffs Cannot Show a Substantial Need for the Documents

Because the documents are work product, they are only discoverable if Plaintiffs show they have substantial need for the materials in the preparation of their case and that they are unable without undue hardship to obtain the substantial equivalent of the materials by other means.  *Corley v. Rosewood Care Ctr.*, 142 F.3d 1041, 1052 (7th Cir. 1998).  Plaintiffs cannot meet this burden.  While not clear, Plaintiffs seem to argue they have a substantial need for the declarations because they want to investigate (i) whether the declarants were "fully informed of the significance of the declarations," (ii) whether the declarations are accurate, and (iii) whether nurses felt compelled to sign inaccurate declarations.  (Pls. Mtn. pp. 9-10.)  The first and third arguments fail at the outset.  The documents themselves would not reveal whether the declarants

---

(cont'd)

*Indus.*, 224 F.R.D. 438, 441 (S.D. Ind. 2004) (citing *U.S. v. Nobles*, 422 U.S. 225, 238-39 (1975)) (materials drafted by non-attorneys can be protected work product).  That third parties signed the declarations is likewise irrelevant to application of the privilege.  *See 1100 West*, 2007 WL 2904073, at *2; *In re Convergent Technologies Second Half 1984 Sec. Litig.*, 122 F.R.D. at 565; 8 Wright & Miller, Federal Practice and Procedure § 2024, at 532.

- 13-

were informed about the declarations' significance or felt compelled to sign them. Clearly, then, there is no substantial need for the documents based on these arguments.

Plaintiffs' second argument is untenable because the accuracy of declarations does not create a substantial need for them. *See 1100 West*, 2007 WL 2904073, at *2-3 (citing *Hickman*, 329 U.S. at 512-13) (affiant's admission that portions of his affidavit were incorrect or not within his personal knowledge does not create a substantial need for the affidavit). *See also McPeek v. Ashcroft*, 202 F.R.D. 332, 339 (D.D.C. 2001) ("if the desire to impeach a witness with prior inconsistent statements is a sufficient showing of substantial need, the work product privilege would cease to exist; there is not a lawyer born who would not like to see opposing counsel's file in order to search for inconsistencies in opposing witnesses' potential testimony."). As a practical matter, Plaintiffs will be able to investigate the veracity of the declarations if Defendants decide to use them in support of their briefs on certification or otherwise in the case.

Accordingly, because the declarations are work product and Plaintiffs have failed to show a substantial need for them, Defendants should not be required to produce them.

### 3. Defendants Should Not Be Required to Produce the Declarants' Contact Information

Similarly unsubstantiated is Plaintiffs' request that Defendants produce the declarants' contact information. A party may request the identities of persons having knowledge of relevant facts, but not "in a fashion that effectively infringes upon the opposing attorney's preparation of the case for a trial." *Bd. of Educ. of Evanston Twp. High Sch. Dist. No. 202 v. Admiral Heating & Ventilating, Inc.*, 104 F.R.D. 23, 32 (N.D. Ill. 1984). To give opposing counsel the names of every individual Defendants have interviewed "is to . . . afford them the potential for significant insights into the defense lawyers' preparation of their case (and thus their mental processes)." *Id. See also BASF Corp. v. Old World Trading Co.*, No. 86-cv-5602, 1992 WL 22201, at *3

- 14-

(N.D. Ill. Jan. 31, 1992) ("Old World has no more right to ask BASF which [potential witnesses] BASF has interviewed that [sic] it has to ask BASF which piece of evidence plaintiff's counsel considers most important"); *In re Ashworth, Inc. Sec. Litig.*, 213 F.R.D. 385, 389 (S.D. Cal. 2002) (providing information on individuals who helped provide facts for the complaint "would necessarily reveal counsel's opinions regarding the relative importance of these witnesses, the highlights of their testimony/factual knowledge, and would link any future statements by the witnesses with . . . counsel's legal theories and conclusions . . .").

Here, providing Plaintiffs the identities of nurses interviewed would reveal Defendants' mental impressions regarding whose information is viewed as important and whose is not. Thus, the information is work product. Plaintiffs' argument that they have a substantial need for this information so they can speak with the declarants about the declaration process and whether they felt compelled to sign inaccurate declarations (Pl. Mtn. p. 10) is unavailing. As demonstrated above, other than the self-serving declarations from two Plaintiffs in this case, Plaintiffs have offered no evidence that non-party nurse declarants (who are, after all, the subject of this motion) were compelled, coerced or misled into signing inaccurate declarations. Accordingly, Defendants should not be required to produce the declarants' information at this point.[9]

## III.    CONCLUSION

For the reasons stated above, Plaintiffs' motion should be denied in full.

---

[9] If this Court requires Defendants to produce the declarations or the names and addresses of the declarants, Plaintiffs should be required to produce the same documents/information. Plaintiffs have listed 12 nurse declarations, without indicating the nurses' names, on their privilege log as protected by attorney work product. *See* Plaintiffs' First Supplemental Privilege Log 1-11, 17 (attached as Exhibit K). If Defendants' declarations are not work product, neither are Plaintiffs'.

- 15-

Respectfully submitted,

RESURRECTION HEALTH CARE
CORPORATION, SAINT JOSEPH
HOSPITAL, SAINTS MARY AND
ELIZABETH MEDICAL CENTER, OUR
LADY OF THE RESURRECTION
MEDICAL CENTER, WEST SUBURBAN
MEDICAL CENTER, WESTLAKE
COMMUNITY HOSPITAL,
RESURRECTION MEDICAL CENTER,
HOLY FAMILY MEDICAL CENTER, and
SAINT FRANCIS HOSPITAL


By:  s/ Timothy J. Tommaso
                    One of Their Attorneys

Michael G. Cleveland
Thomas M. Wilde
Joseph K. Mulherin
Timothy J. Tommaso
Vedder Price P.C.
222 North LaSalle Street, Suite 2600
Chicago, IL  60601-1003
(312) 609-7500

Dated:  January 6, 2012

- 16-

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of DEFENDANTS' RESPONSE

TO PLAINTIFFS' MOTION FOR A PROTECTIVE ORDER was served on:

Douglas M. Werman
Maureen A. Bantz
David E. Stevens
Werman Law Office, P.C.
77 W. Washington, Suite 1402
Chicago, IL 60602

by electronic means, on January 6, 2012.


s/ Timothy J. Tommaso
An Attorney for Defendants