**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| TITA CAMILOTES, EDITH ASIDAO, RONDA BRADY, FABIENNE FIFY, CHIARA DEL GIUDICE, ETHEL BARBEE, RACHELLE VARDON, DONALD MOARN, CANDACE DOBRINO, individually and on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> RESURRECTION HEALTH CARE CORPORATION, SAINT JOSEPH HOSPITAL, SAINTS MARY AND ELIZABETH MEDICAL CENTER, OUR LADY OF THE RESURRECTION MEDICAL CENTER, WEST SUBURBAN MEDICAL CENTER, WESTLAKE COMMUNITY HOSPITAL, RESURRECTION MEDICAL CENTER, HOLY FAMILY MEDICAL CENTER, and SAINT FRANCIS HOSPITAL, <br><br> Defendants. | Case No. 10 C 366 |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiffs have moved for a protective order requiring Defendants to cease communicating with staff nurses about this lawsuit on the hospitals' premises and during work hours. They further ask the Court to order Defendants to produce the signed declarations they obtained from staff nurses and to provide the nurses' contact information. Plaintiffs also seek copies of the unsigned declarations of two nurses who are plaintiffs in this action. For the following reasons, the Court grants Plaintiffs' motion in part and denies it in part.

## BACKGROUND

**I.     Plaintiffs' Claims**

Plaintiffs filed their Complaint against Defendants Resurrection Health Care Corporation, *et al.* ("Defendants") pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* Plaintiffs, non-exempt staff nurses employed by Defendants, allege that Defendants failed to compensate them for all hours worked. Specifically, Plaintiffs allege that although Defendants regularly required Plaintiffs to work through all or part of their meal breaks, Defendants subjected Plaintiffs to automatic deductions for their scheduled meal breaks. In addition to their FLSA claims, Plaintiffs also seek to recover unpaid wages under the Illinois Minimum Wage Law ("IMWA"), 820 ILCS 105/1 *et seq.*, the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.*, and Illinois common law. Plaintiffs seek to bring their FLSA claim as a collective action under 29 U.S.C. § 216(b) and their IMWA and IWPCA claims as a class action under Federal Rule of Civil Procedure ("Rule") 23.

On September 13, 2010, the Court entered an order authorizing Plaintiffs to mail a notice to join the FLSA collective action to hourly nurses whom Defendants employ. Plaintiffs sent notices to 5,029 nurses, and 303 of those opted to join the FLSA class (the "Opt-In Plaintiffs"). Subsequently, 86 of the 303 Opt-In Plaintiffs either voluntarily dismissed their claims or withdrew from the lawsuit, leaving an FLSA class of 217 individuals. Plaintiffs have not yet filed their motion to certify the class under Rule 23.

## II.     Defendants' Contacts with Putative and Opt-In Plaintiffs

### A.     The interviews

During the course of this litigation, project assistants at Defendants' counsel's law firm interviewed nurses who are employed by Defendants in order to investigate the allegations in Plaintiffs' Complaint. (R. 163 at 3.) Defendants state that they sought to interview only nurses who had not opted into the FLSA class and were not otherwise represented by Plaintiffs' counsel or other counsel. (*Id.*)

The project assistants worked individually to interview the nurses separately, and no lawyer or representative from management or human resources was present during the interviews. (*Id.*, citing R. 163-1, Woods Decl. ¶¶ 2-3, 5, 7; R. 163-2, Yoo Decl. ¶¶ 2-5; R. 163-3, Hekhuis Decl. ¶¶ 2-5.[1]) Before each interview, the project assistant conducting the interview read the following preliminary statement:

> My name is [] and I am a project assistant at the Chicago law firm of Vedder Price P.C. My firm is representing [insert hospital] in a lawsuit filed by some current and former nurses who claim they were not paid all wages that were due [sic] them. These nurses are seeking to bring their claims on behalf of all nurses who worked at the hospitals during the last [five] years, which includes you.
>
> To help us in defending this case, I'd like to ask you some questions about your job and how your hours of work are recorded and paid.
>
> Before we begin, have you have [sic] been contacted by any lawyer about this case? **[If so, did you agree to be represented by counsel?] [Note - if they talked to counsel and are represented by counsel, END the conversation.] [DO NOT ASK WHAT THEY SPOKE ABOUT]**

---

[1] Defendants submitted declarations from each project assistant who interviewed the nurses. *See* R. 163-1, 163-2, and 163-3.

> Please understand that you don't have to speak with me or answer any of my questions. You can leave right now if you wish to. Or at any time while we're talking, you can stop the interview and leave. Your participation is completely voluntary.
>
> Also, please understand that your job will not be affected in any way because you decide to talk with me, or not to talk with me. The Hospital will not give you any benefits or take any action against you. The Hospital will not do anything to affect your job, either favorably or unfavorably, because of any answers you give to my questions.
>
> Do you understand what I have just explained? Do you have any questions about what I have just told you? Is it all right with you if we go ahead with the interview?

R. 163-1 at Exhibit 1, Preliminary Statement.

One nurse declined to be interviewed after hearing the preliminary statement. (R. 163-2, Yoo Decl. ¶ 7.) Two nurses told the project assistants at the end of the interview that they would not be willing to sign a declaration, and neither Defendants nor their counsel asked them to sign a declaration again. (R. 163-1, Woods Decl. ¶ 10; R. 163-2, Yoo Decl. ¶ 9.)

After completing the interviews, Defendants obtained declarations from 52 nurses at five hospitals, including Saints Mary and Elizabeth Medical Center ("SMEMC"), West Suburban Medical Center ("WSMC"), Our Lady of the Resurrection Medical Center ("OLR"), Resurrection Medical Center ("RMC") and St. Francis Hospital ("St. Francis").[2] (R. 163-1, Woods Decl. ¶ 12; R. 165 at 1, n.1.) In general, in order to obtain the declarations, someone from the human resources department at the Defendant hospital contacted the nurses and asked

---

[2] This number does not include Evangaline Biglang-Awa's declaration, which Defendants have agreed to withdraw. (R. 163 at 4.)

them to review the declaration and sign it if they agreed with its contents.[3] (R. 165 at 5.)

### B. Obtaining the declarations

The parties dispute the details of how Defendants obtained the declarations from the nurses. The nurses at WSMC, OLR, RMC, and St. Francis signed their declarations within four months after the time of their interview. The human resources representatives at these hospitals told the nurses that they could edit the declarations if they disagreed with the contents. One nurse at RMC and one at St. Francis did not sign their declarations because they were not comfortable doing so. (R. 163-7, Ottlinger Decl. ¶ 8; R. 163-8, Linquist Decl. ¶ 6.) Plaintiffs do not submit declarations or other evidence regarding Defendants' contacts with the nurses who work at the four above-mentioned hospitals.

With respect to SMEMC, the facts are different. A year and a half lapsed between the time the project assistants interviewed the nurses and the time SMEMC's human resources representative asked them to sign their declarations. *See* R. 157-1, Exhibit A, Brito Decl. at ¶¶ 2-3, 6; R. 157-1, Exhibit B, Biglang-Awa Decl. ¶¶ 2-3, 6. Plaintiffs' counsel currently represents three of the nurses whom SMEMC contacted to sign declarations–Evangeline Biglang-Awa, Kiersten Sullivan, and Irma Brito–all of whom are currently Opt-In Plaintiffs. At the time Defendants interviewed these three nurses, they were not members of the opt-in class. Ms. Biglang-Awa was the only nurse out of those three that signed her declaration. After Ms. Brito was asked to sign her declaration, she wrote a note to the Human Resources Director

---

[3] Defendants have submitted declarations from human resource department representatives from all five hospitals, including two declarations from SMEMC. *See* R. 163-4, R. 163-5, R. 163-6, R. 163-7, R. 163-8, R. 163-9.

stating "I was in HR to sign my Declaration and wanted to discuss it with you before I sign it." (R. 163-9, Piekielny Decl. ¶ 9 and Exhibit 1.)

The parties dispute whether the human resource representatives told Ms. Biglang-Awa and Ms. Brito that they could make edits to their declarations. Ms. Biglang-Awa and Ms. Brito aver that the SMEMC human resources representative did not tell them that they could make changes to their declarations. (R. 157-1, Exhibit A, Brito Decl. ¶ 7; R. 157-1, Exhibit B, Biglang-Awa Decl. at 7.) Declarations from the human resources employees at SMEMC, on the other hand, provide that the SMEMC human resource representative told the nurses to talk with the Human Resources Director if they did not agree with the contents of their declaration or if they wanted to make changes or had questions. (R. 163-4, Starks Decl. ¶ 4; R. 163-9, Piekielny Decl. ¶ 5.) The declarations further show that five out of twenty nurses from SMEMC made edits to their declarations before they signed them and that three others from SMEMC, including Ms. Brito and Ms. Sullivan, did not sign their declarations. (R. 163-4, Starks Aff. ¶¶ 5, 10; R. 163-9, Piekielny Aff. ¶ 6.)

In September 2011, Defendants' counsel contacted Plaintiffs' counsel to advise them that they had inadvertently contacted three nurses who are members of the FLSA opt-in class and asked them to sign declarations. Defendants' counsel subsequently told Plaintiffs' counsel that they would not use Ms. Biglang-Awa's declaration in the litigation. Plaintiffs' counsel obtained a copy of Ms. Biglang-Awa's declaration.

## LEGAL STANDARD

Both Plaintiffs' and Defendants' counsel have the right to communicate with putative class members. *EEOC v. Mitsubishi Motor Mfg. of Am., Inc.*, 102 F.3d 869, 870 (7th Cir. 1996)

(citing *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981)); *see also Williams v. Chartwell Fin. Servs., Ltd.*, 204 F.3d 748, 759 (7th Cir. 2000). Due to "the potential for abuse," however, "a district court has both the duty and the broad authority," pursuant to Federal Rule of Civil Procedure 23(d), "to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil*, 452 U.S. at 100; *Williams*, 204 F.3d at 759. Such discretion, however, is not unlimited. *Gulf Oil*, 452 U.S. at 100 (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974)).

The Supreme Court has cautioned that district courts may not exercise their power to restrict communications between parties and potential class members "without a specific record showing by the moving party of the particular abuses by which it is threatened." *Gulf Oil*, 452 U.S. at 102 (citing *Coles v. Marsh*, 560 F.2d 186, 189 (3d Cir. 1977), *cert. denied*, 434 U.S. 985, 98 S.Ct. 611, 54 L.Ed.2d 479 (1977)). Two types of communications are generally concerning to courts–"those containing misrepresentations and those which may discourage persons from opting into the class." *See Snide v. Discount Drug Mart, Inc.*, No. 1:11 CV 0244, 2011 WL 5434016, at *9-10 (N.D. Ohio Oct. 7, 2011) (citing *Belt v. Emcare, Inc.* 299 F. Supp.2d 664, 668 (E.D. Tex. 2003) and *Dominguez v. Don Pedro Rest.*, No. 2:06 CV 241, 2007 WL 1650289, *2 (N.D. Ind. June 1, 2007)). Before a district court may issue a protective order in this circumstance, it must carefully balance "the potential for abuse created by the class action and the right of the [party] to contact potential class members." *Williams*, 204 F.3d at 759. Further, such an order must "be based on a clear record and specific findings that reflect a weighing of

the need for a limitation and the potential interference with the rights of the parties." *Gulf Oil*, 452 U.S. at 101.

## ANALYSIS

### I. Plaintiffs Have Not Met Their Burden of Showing a Clear Record of Coercion or Other Improper Influence

Before the Court may restrict Defendants' ability to contact putative plaintiffs at Defendants' hospitals and during work hours, Plaintiffs must meet their burden of demonstrating that Defendants' counsel have engaged in, or have threatened to engage in, coercive, misleading, or other abusive communications with the putative class. *See Jones v. Nat'l Council of Young Men's Christian Ass'ns*, No. 09 C 6437, 2011 WL 1312162, at *6 (N.D. Ill. Mar. 31, 2011) (denying motion for protective order where the plaintiffs did not demonstrate that defense counsel engaged in "coercive behavior to obtain declarations from putative class members" and where the plaintiffs did not show any "actual or imminent abuse" by the defendants); *O'Brien v. Morse*, No. 02 C 50026, 2002 WL 1290392, at *2 (N.D. Ill. 2002) ("A protective order should only be issued if the record reflects a clear finding of potential abuse."). Plaintiffs have not met this burden.

The Court first addresses Defendants' contacts with three SMEMC employees – Ms. Brito, Ms. Biglang-Awa, and Ms. Sullivan – all of whom are opt-in Plaintiffs and are represented by counsel. It is axiomatic that counsel for a party may not contact the opposing party directly if that party is represented by counsel. *See* American Bar Association Model Rules of Professional Conduct 4.2 ("In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court

order."); Northern District of Illinois Local Rule 83.50 ("Applicable disciplinary rules are the Model Rules adopted by the American Bar Association."). Defendants' contact with Ms. Brito, Ms. Biglang-Awa, and Ms. Sullivan after they joined the case as opt-in Plaintiffs was therefore improper. Although these three nurses were not parties to the case at the time the project assistants interviewed them, Defendants' counsel should have conducted the necessary factual research to ensure that, in the year and a half period between when the interviews took place and when the declarations were ready to sign, the nurses with whom they met had not opted in to the FLSA class.

Defendants' contact with these three nurses, however, was inadvertent, and Defendants' counsel brought it to the attention of Plaintiffs' counsel immediately after they learned that these three nurses were part of the opt-in class. Moreover, Defendants' counsel has agreed not to use the declaration Defendants obtained from Ms. Biglang-Awa, and therefore Plaintiffs will suffer no prejudice as a result of Defendants' contact with her. As Defendants point out, neither Ms. Brito nor Ms. Sullivan signed a declaration, so Plaintiffs suffered no discernable prejudice by virtue of Defendants' contact with those two nurses. All three nurses remain opt-in Plaintiffs. Accordingly, Defendants' inadvertent, but improper, contact with these three nurses is not sufficient to warrant a broad restriction on Defendants' ability to contact all putative plaintiffs in the future.[4] *See Zwerin v. 533 Short North, LLC*, No. 2:10-cv-488, 2011 WL 2446622, at *3-4 (S.D. Ohio June 15, 2011) (despite the defendant communicating with a represented plaintiff, the court refused to enter blanket protective order).

---

[4] It goes without saying that Defendants shall have no further direct contact with Ms. Brito, Ms. Biglang-Awa, or Ms. Sullivan regarding this case.

Plaintiffs contend that Defendants' communications with class members pose a "heightened potential for coercion" because of their ongoing employment relationship and that such risk was further exacerbated by the fact that "nurses were interviewed and presented with declarations at the hospitals' premises and during work hours." (R. 157 at 8.) Although there exists the potential for coercion in employer-employee relationships, that risk is present in virtually every FLSA case and does not, alone, justify the relief Plaintiffs seek in this case. *See Wiginton v. C.B. Richard Ellis*, No. 02-cv-6832, 2003 WL 22232907, at *3 (N.D. Ill. Sept. 16, 2003) (rejecting the plaintiffs' argument that the defendants' communication with putative class members should be restricted due to the "inherent coerciveness of the employer-employee relationship"); *Jones*, 2011 WL 1312162 at *6 ("Although an at-will employee-employer relationship can produce a potential for coercion, the existence of an employee-employer relationship alone is not enough to justify restricting Defendants' communications."); *Kuhl v. Guitar Ctr. Stores, Inc.*, No. 07 C 214, 2008 WL 5244570, at *5 (N.D. Ill. Dec. 16, 2008) (finding no clear record of improper communications despite the fact that defendant employers conducted interviews of employees at their place of employment and during work hours).[5]

The Court disagrees that Ms. Brito's and Ms. Biglang-Awa's declarations demonstrate that "staff nurses felt pressured to sign declarations presented to them at the Defendant hospital facilities." (R. 157 at 9.) Ms. Biglang-Awa, Plaintiffs aver, had concerns that her refusal to sign

---

[5] The cases Plaintiffs cite are not controlling on this Court and also involved circumstances dissimilar to those present here. *See Mevorah v. Wells Fargo Home Mortg., Inc.*, No. 05-1175, 2005 WL 4813532, at *4 (N.D. Cal. Nov. 17, 2005) (the defendants' counsel misrepresented the nature of the case and its potential affect on employees); *Ojeda-Sanchez v. Bland Farms*, 600 F. Supp.2d 1373, 1376-77 (the defendant's representatives traveled from Georgia to potential opt-in plaintiffs' homes in Mexico and coerced them to disavow any participation in the lawsuit).

the declaration would negatively impact her employment with SMEMC, and she allegedly felt pressured to make a quick decision because the human resources representative presented the declaration to her during work hours while she had patients to whom she had to attend. Plaintiffs have not shown, however, that Defendants ever told Ms. Biglang-Awa that her employment with SMEMC would be negatively impacted if she did not sign the declaration, and they do not dispute that Defendants read the preliminary statement to Ms. Biglang-Awa during her interview, which included the following statement:

> Also, please understand that your job will not be affected in any way because you decide to talk with me, or not to talk with me. The Hospital will not give you any benefits or take any action against you. The Hospital will not do anything to affect your job, either favorably or unfavorably, because of any answers you give to my questions.

R. 163-1 at Exhibit 1, Preliminary Statement; *see Dominguez*, 2007 WL 1650289, at *2 (finding no clear record of coercion where the defendant's statements to its employees did not directly indicate its intent to discourage participation in the lawsuit and where the plaintiffs did not "link [the employee's] fear of retaliation to actual conduct by the defendant"); *see also Kuhl*, 2008 WL 5244570 at *5 (court declined to infer that the defendants took advantage of their position as employers where the defendants did not caution the employees against participating in the lawsuit or suggest that the case could adversely impact their employment).

Moreover, the notice Plaintiffs provided to Ms. Biglang-Awa and other nurses employed by Defendants pursuant to 29 U.S.C. § 216(b) contained a provision which unequivocally stated that Defendants are prohibited by law from taking action against employees who exercise their

rights under federal wage and hour laws.[6] *See Dominguez*, 2007 WL 1650289 at *3 (relying in part on information explained to potential opt-in plaintiffs in the FLSA notice as a basis for denying the plaintiffs' motion for a protective order).[7] Due to the extensive lapse in time between when Defendants interviewed the nurses and when they asked the nurses to sign the declarations, Defendants would have been well-advised to repeat the preliminary statement to the nurses at SMEMC (and the other Defendant hospitals) before asking them to sign the declarations. Their failure to do so in this instance, however, is insufficient to prove that their communications with the nurses were coercive or otherwise improper.

Plaintiffs also point to inaccuracies in Ms. Brito's and Ms. Biglang-Awa's declarations as evidence of Defendants' allegedly inappropriate conduct.[8] Notably missing, however, is any evidence or allegation that Ms. Biglang-Awa told anyone at SMEMC that her declaration contained inaccuracies or that Defendants told her she could not make changes to the

---

[6] *See* R. 72, Exhibit A, Notice at 3. A section entitled "YOUR RIGHTS AND OPTIONS," which is structured in a question and answer format, contains the following question and answer: Q: "I am afraid Resurrection may take some action against me if I join." A: "Federal law prohibits Resurrection from discouraging or in any other way discriminating against you because you have exercised your rights under the federal wage and hour laws. Such conduct would be illegal and you are entitled to additional damages should a court determine Resurrection took any action against you for joining this lawsuit. You should not be afraid to join this lawsuit for fear that Resurrection, or anyone else, will retaliate against you. Resurrection is aware that this notice is being sent to you."

[7] The fact that Defendants did not tell the nurses that they may be entitled to compensation if they performed work during their unpaid meal periods does not render the communications misleading or coercive, especially given that the notice distributed to the potential opt-in plaintiffs before the nurses signed the declarations informed the nurses of this fact.

[8] Ms. Biglang-Awa stated in her declaration submitted in support of Plaintiffs' motion that she signed, but did not date, the declaration in the hopes that leaving it undated would render it invalid. (R. 157-1, ¶ 17.)

12

declaration. Additionally, Defendants have submitted evidence that the SMEMC human resource representative who asked Ms. Biglang-Awa and Ms. Brito to sign the declarations, Mr. Starks, explained to the nurses that if they did not agree with any statement in the declaration or wanted to make changes, they should talk to the Director of Human Resources, Ms. Piekielny. (R. 163-4, Starks Decl. ¶ 7.) Indeed, this is exactly what Ms. Brito did, and she thereafter declined to sign her declaration. (R. 163-9, Piekielny Decl. ¶ 9 and Exhibit 1; R. 157-1, Exhibit A, Brito Decl. ¶ 16.) Mr. Starks also told the nurses that he did not want them to sign the declaration unless they were comfortable doing so. (R. 163-4, Starks Decl. ¶ 8.) Furthermore, Defendants have submitted evidence that 25% of the SMEMC nurses who signed declarations made revisions to the declarations before they signed them, and another 15% declined to sign the declarations. (*Id.* ¶ 5; R. 163-9, Piekielny Decl. ¶ 6.)

The fact that Defendants did not tell the nurses that they could review the declarations with an attorney is also insufficient to establish a clear record of abusive communications. At least one court in this District has held that failure to advise employees that they have a right to obtain counsel does not render a communication misleading or otherwise improper. *See Kuhl*, 2008 WL 5244570 at *5. The Court agrees with that decision and notes that the opt-in notice Plaintiffs' counsel sent to the employee nurses advised them that they may choose to opt into the FLSA class or retain their own counsel.

Finally, the fact that Defendants did not tell the nurses that the declarations could be used against the nurses who filed the lawsuit also does not render the communications coercive or misleading. As is evident from the preliminary statement, the project assistants who interviewed the nurses told them that they represented the hospital in a lawsuit brought by current and former

13

nurse employees, including the interviewees, who claimed they were not paid for all of the time they worked. R. 163-1 at Exhibit 1, Preliminary Statement. This is an accurate representation of the lawsuit. Although the project assistants did not explain to the nurses the legal significance of signing the declarations, they told the nurses that they wanted to interview the nurses to "help [the hospitals] defend the case." *Id.* By doing so, they made it clear to the nurses that their statements during the interview could be used against the plaintiffs. They also explained to the nurses that their participation in the interview was completely voluntary and that they could ask any questions they had. *Id.*

## II. Plaintiffs Are Entitled to Copies of the Declarations and to the Declarants' Contact Information

Although Plaintiffs have not established a "clear record" indicating that Defendants' communications with their employees were misleading or coercive, Plaintiffs are nevertheless entitled to copies of the declarations and the declarants' contact information. *See Kuhl*, 2008 WL 5244570 at *6 (ordering the defendants to produce signed employee statements because such statements did "not contain any legal advice, litigation strategy, or confidential communications"); *see also Dominguez*, 2007 WL 1650289 at *3 (noting that signed affidavits are subject to disclosure as discovery under the Federal Rules of Civil Procedure). Defendants have failed to establish that the signed declarations are protected from disclosure by the work product doctrine, which protects attorney impressions but does not protect non-privileged facts. *See Hickman v. Taylor*, 329 U.S. 495, 513, 67 S.Ct. 385, 91 L.Ed. 451 (1947); *see also Vardon Golf Co., Inc. v. Karsten Mfg. Corp.*, 213 F.R.D. 528, 534 (N.D. Ill. 2003) (citing *Hickman*, 329 U.S. at 513).

Defendants' argument that the signed declarations "summarize the Project Assistants' understanding of the witnesses' statements" is nonsensical. A declaration, by its nature, contains the declarant's factual statements, made under penalty of perjury. The declarant may be called upon to testify regarding the statements he or she made in the declaration, and he or she must have personal knowledge of each statement. Indeed, the declarations at issue contain a statement that the declarant "has personal knowledge of all matters set forth in this declaration and, if called to testify, could competently testify thereto." *See*, *e.g.*, R. 157-1, Exhibit D. Surely, Defendants' counsel would not ask the nurses to testify that they have personal knowledge of Defendants' attorneys or project assistants' mental impressions. Because the signed declarations contain factual statements, they are subject to disclosure.[9] Additionally, because the nurse declarants are potential witnesses in this case, Plaintiffs are entitled to their contact information.

For the same reasons, Plaintiffs are also entitled to copies of Ms. Brito's and Ms. Sullivan's unsigned declarations. Defendants do not dispute that they attempted, improperly, to have Ms. Brito and Ms. Sullivan sign such declarations. By presenting the declarations to them, Defendants acknowledged that the statements therein were facts as to which Ms. Brito and Ms. Sullivan had personal knowledge and were not, as Defendants mistakenly claim, attorney impressions.

## CONCLUSION

For the reasons set forth above, the Court denies Plaintiffs' motion for a protective order but grants their motion to the extent it seeks an order requiring Defendants to produce certain

---

[9] Plaintiffs, on the other hand, are not required to produce declarations they obtained from their own clients because those declarations are protected by the attorney-client privilege.

documents and information. Specifically, Defendants must produce to Plaintiffs' counsel, within 14 days, copies of all signed declarations identified to date on their privilege logs and copies of Ms. Brito's and Ms. Sullivan's unsigned declarations. Defendants must also produce any signed declarations they obtain in the future from Defendants' current or former nurses within 14 days of the date the nurses sign the declarations.

**Date:** January 25, 2012

                                          **ENTERED**

                                          _____
                                        **AMY J. ST. EVE**
                                        **United States District Court Judge**