**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| TITA CAMILOTES, *et al.*, individually, and on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> RESURRECTION HEALTH CARE CORPORATION, *et al.*, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> )   No. 10-cv-366 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Plaintiffs filed their Complaint against Defendants pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.* Plaintiffs, non-exempt staff nurses employed (or formerly employed) by Defendant hospitals, allege that Defendants regularly required Plaintiffs to work through all or part of their meal breaks. They further allege that Defendants subjected Plaintiffs to automatic time deductions for their meal breaks and therefore did not pay them for hours worked during those breaks. In addition to their FLSA claims, Plaintiffs also seek to recover under the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq.*[1] Before the Court are two motions: (1) Plaintiffs' motion for class certification of its IMWL claim pursuant to Federal Rule of Civil Procedure ("Rule") 23; and (2) Defendants' motion to decertify the

---

[1] On July 16, 2012, the Court granted Defendants' motion for partial summary judgment on Plaintiffs' claim under the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.*, and Plaintiffs' common law unjust enrichment claim. *See Camilotes v. Resurrection Health Care Corp.*, No. 10-cv-366, 2012 WL 2905528 (N.D. Ill. July 16, 2012). On September 5, 2012, the Court denied Plaintiffs' motion for reconsideration of the Court's July 16, 2012 Order. (*See* R. 259.) To the extent Plaintiffs' motion seeks certification of a class for their IWPCA claim, it is denied as moot.

FLSA collective action.  For the reasons explained below, the Court denies Plaintiffs' motion

and grants Defendants' motion.

## BACKGROUND

Named Plaintiffs Tita Camilotes, Ethel Barbee, Ronda Brady, Chiara Del Giudice,

Candace Dobrino, Fabienne Fify, Donald Moarn, and Rachelle Vardon are or were employed as

staff and charge nurses at five of the eight Defendant hospitals, including Our Lady of the

Resurrection Medical Center ("OLR"), Saint Joseph Hospital ("SJH"), Saints Mary and

Elizabeth Medical Center ("SMEMC"), West Suburban Medical Center ("WSMC"), and

Westlake Community Hospital ("WLH").  Named Plaintiffs did not work at Defendants Holy

Family Medical Center ("HFMC"), Resurrection Medical Center ("RMC"), or Saint Francis

Hospital ("SFH") during the relevant time period.

On September 13, 2010, the Court granted Named Plaintiffs' unopposed motion to

approve the form of notice to similarly situated persons pursuant to 29 U.S.C. § 216(b), and, by

stipulation, conditionally certified this case as a collective action.  (R. 72, 74.)  Plaintiffs

thereafter sent notices to 5,029 nurses.  Out of the 5,029 nurses, 209 opted to join the FLSA class

(the "Opt-In Plaintiffs").  Subsequently, 86 Opt-In Plaintiffs either voluntarily dismissed their

claims or withdrew from the lawsuit.  The current FLSA class consists of 217 individuals—

eight named plaintiffs (the "Named Plaintiffs") and 209 Opt-In Plaintiffs.

## I.     Defendants' Corporate Structure and Human Resource Policies

Defendant Resurrection Health Care Corporation ("RHC") is the parent of Defendant

hospitals.[2]  Although they share the same parent company, each Defendant hospital has its own

---

[2]  As of July 10, Defendants WSMC and WLH are no longer a part of the RHC system.

2

board of directors and officers. (R. 187-10, Skiem Tr. 58:6-16.) Each Defendant hospital also has a Chief Nursing Officer, who is responsible for overseeing patient care services. (R. 187-1, Brown Tr. 12:23-13:13; R. 187-4, Lambert Tr. 12:1-6.) In addition, each Defendant hospital has its own Director of Human Resources, who ultimately reports to RHC's Senior Vice President of Human Resources. (R. 179-7, Van Dyke Tr. 11:3-12:20, 15:13-16:4; R. 179-3, Brown Tr. 15:9-12.)

RHC has created and maintains a system-wide set of human resource policies ("HR Policies"). (R. 179-1, Brown Tr. 33:18-20, 51:21-52:4, 56:16-20.) RHC, for example, has a compensation policy that applies to all nurses system-wide. (R. 179-1, Brown Tr. 51:21-52:4 and Exhibit 8.) RHC's human resource policy provides:

1. Meal periods are administered as follows:

    1.1 Non-exempt employees who are scheduled for a shift of seven and one-half hours or longer will receive a thirty-minute unpaid meal period no later than five hours after they begin work. Departments will schedule meal periods to accommodate work needs.

    1.2 If a non-exempt employee works during his/her meal period, the 30 minutes will be paid. Manager approval is required for an employee to work through his/her scheduled meal period. Such approval must be noted on the employee's time document (see Pay Practices/Time Records policy).

2. Rest breaks are administered as follows:

    2.1 Departments may schedule one or more paid rest breaks for non-exempt employees during the work day as workload permits. Rest breaks generally last no longer than fifteen minutes.
    . . .

    2.3 If an employee misses rest break for any reason, including department workload requirements, the employee will not be eligible for additional pay or time off due to the unused break, since the rest break is already paid.

3.     Combining paid rest breaks with unpaid meal periods is a matter of department policy.

(R. 179-3, Ex. 4 to Skiem Tr. at SMEMC009319-20.)  RHC's Employee Handbook summarizes

RHC's meal break policy, and states:

MEAL PERIODS

Non-exempt employees who work a shift of at least seven and one-half (7-1/2) hours receive a thirty (30) minute unpaid meal period as assigned by the manager no later than five (5) hours following commencement of the shift.  The meal period is not counted as time worked.  Your manager will assign you a meal period and advise you of the meal period policy for your particular shift.

(R. 179-3, Skiem Tr. Ex. 3 at SMEMC 008158.)

Defendant hospitals use RHC's policies as a guideline, but they have discretion to

interpret and implement the policies.  (R. 187-2, Gunnell Tr. 65:14-20; R. 187-10, Skiem Tr.

83:10-84:6; R. 187-31, Bajgrowicz Decl. ¶¶ 15-17; R. 187-32, Edwards Decl. ¶¶ 13-14; R. 187-

33, Lambert Decl. ¶¶ 13-14; R. 187-34, Miserendino Decl. ¶¶ 13-14; R. 187-35, Richard Decl.

¶¶ 15-16.)  Each Defendant hospital delegates to individual managers the responsibility of

customizing and implementing RHC's policies in a manner that makes sense for the particular

department.  (R. 187-31, Bajgrowicz Decl. ¶ 17; R. 187-32, Edwards Decl. ¶ 15; R. 187-33,

Lambert Decl. ¶ 16; R. 187-34, Miserendino Decl. ¶ 15; R. 187-35, Richard Decl. ¶ 17.)  In

particular, managers implement policies and practices regarding how to schedule meal periods,

where employees may take their meal periods, how employees are relieved from duty for their

meal periods, whether employees may take assigned cell phones or pagers with them on their

meal periods, whether supervisory permission is required to take a meal period, and how

employees record time worked during meal periods.  (*Id.*)

4

II.    **Defendants' Timekeeping System**

Since 2008, Defendants have compiled work time data and processed payroll for their

employees through a centralized payroll software application, known as McKesson STAR.

(R. 179-2, Hinz Tr. 13:18-16:2.)  Defendants currently use a system-wide automated

timekeeping system for nurses (the "API System"), which requires the nurse to "swipe in," using

an identification badge, when he or she begins work and to "swipe out" when he or she stops

working.  (R. 179-1, Brown Tr. 40:14-22; R. 179-4, Gunnel Tr. 22:4-23:7.)  Defendants

implemented the API System at various times between 2004 and 2008.[3]  (R. 179-1, Brown Tr.

62:20-63:3 R. 179-2, Hinz Tr. 13:18-16:2.)

Nurses who work at Defendant hospitals do not manually swipe in and swipe out for

meal breaks.  Instead, under the API System, Defendants automatically deduct 30 minutes of

work time from every non-exempt nurse employee who works a shift lasting at least 7.5 hours,

unless the employee indicates that he or she did not receive a meal period, as explained below.

(R. 179-1, Brown Tr. 101:14-18; R. 179-2, Hinz Tr. 66:6-69:6; R. 179-4, Gunnell Tr. 23:18-5.)

Nurses may indicate that they worked through their meal period by entering a "Code 5" after

swiping out, which cancels the automatic meal period deduction.  (R. 179-1, Brown Tr. 101:19-

22; R. 179-2, Hinz Tr. 69:20-70:18; R. 179-4, Gunnell Tr. 24:6-25:4.)  This is commonly

referred to as a "no lunch punch."  (*See id*.)  The "no lunch punch," however, is not the sole

method by which nurse employees may report that they did not take a meal period.  Employees

may also manually change or correct recorded work time through various other processes,

---

[3] Prior to implementing the swipe in/swipe out timekeeping system, nurses recorded time worked in various ways, including on paper and through automated clock systems.  (R. 187-6, Mueller Tr. 22:15-23:4; R. 187-11, Van Dyke Tr. 67:19-68:8; R. 197-24, Moore Tr. 35:4-8.)

including, but not limited to, filling out a form, verbally notifying a manager, noting the missed meal period in a "log book," notifying a manager via email, or by leaving a Post-It note for the manager. (R. 179-5, Lambert Tr. 42:1-43:18; R. 179-5, McKinley Tr. 49:17-50:6; R. 179-8, Van Dyke Tr. 85:17-86:2; R. 187-118, Woods Decl. Ex. D (citing Declaration testimony); R. 198-2, Gunnell Tr. 120:15-121:9.)

When Defendants implemented the API System in each hospital, they trained employees how to use the system and its various codes. (R. 179-4, Gunnell Tr. 24:20-25:4; R. 187-6, Mueller Tr. 41:14-23; R. 187-11, Van Dyke Tr. 48:20-49:15.) Additionally, in several departments, Defendants have posted notices next to the time clock listing the API timekeeping codes, including Code 5. (R. 187-12, Allen Tr. 59:11-22; R. 187-24, Moore Tr. 35:4-36:16 and Ex. 4.)

Additional facts are discussed, where relevant, within the context of the Court's analysis below.

## LEGAL STANDARD

### I.  FLSA Collective Actions

Pursuant to the FLSA, "employees are entitled to overtime pay (i.e., one and one-half times the regular rate) for any hours worked in excess of forty hours per week, unless they come within one of the various exemptions set forth in the Act." *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 572 (7th Cir. 2012) (citing 29 U.S.C. §§ 207, 213). The FLSA "gives employees the right to bring their FLSA claims through a 'collective action' on behalf of themselves and other 'similarly situated' employees." *Alvarez v. City of Chicago*, 605 F.3d 445, 448 (7th Cir. 2010) (citing 29 U.S.C. § 216(b) (2006)). District courts have broad discretion in managing

collective actions under the FLSA. *Id.* at 449.

The Seventh Circuit has not established criteria for determining whether employees are "similarly situated" for purposes of the FLSA, but "'the majority of courts . . . have adopted a two-step process for determining whether an FLSA lawsuit should proceed as a collective action.'" *See Franks v. MKM Oil, Inc.*, No. 10 CV 00013, 2012 WL 3903782, *9 (N.D. Ill. Sept. 7, 2012) (quoting *Jirak v. Abbott Labs., Inc.*, 566 F. Supp. 2d 845 (N.D. Ill. 2008)); *see also Medina v. Happy's Pizza Franchise, LLC*, No. 10 C 3148, 2012 WL 1094353, *2 (N.D. Ill. Apr. 2, 2012).

At the first stage, a named plaintiff "can show that the potential claimants are similarly situated by making a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Franks*, 2012 WL 3903782, at *9 (citation and quotation marks omitted); *see also Medina*, 2012 WL 1094353, at *2. At the second stage, however, the court's inquiry becomes more stringent. *Franks*, 2012 WL 3903782 at *9 (citing *Jirak*, 566 F. Supp. 2d at 848); *see also AON Corp. Wage & Hour Employment Practices Litig.*, No. 08 C 5802, 2010 WL 1433314, *5 (N.D. Ill. Apr. 8, 2010) ("The second stage analysis requires the court to employ a much stricter standard in making a final determination on the similarly situated question considering a number of factors including the disparate factual and employment settings of the individuals plaintiffs and the defenses available to defendants that are individual to each plaintiff."). At the second stage, the court considers "'(1) whether the plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns.'" *Franks*, 2012

WL 3903782, at *9 (quoting *Mielke v. Laidlaw Transit, Inc*., 313 F. Supp. 2d 759, 762 (N.D. Ill. 2004)).  Plaintiffs bear the burden of demonstrating that they are "similarly situated."  *See Medina*, 2012 WL 1094353, at *2 (citing *Russell v. Illinois Bell Tel. Co., Inc*., 721 F. Supp. 2d 804, 811 (N.D. Ill. 2010).

If a motion to decertify the collective action is unsuccessful, the case proceeds as a collective action.  If it is successful, however, the case "reverts to one or more individual actions on behalf of the named plaintiffs."  *Alvarez*, 605 F.3d at 450.

## II.     Federal Rule of Civil Procedure 23

Rule 23(a) contains four prerequisites for class certification: numerosity, commonality, typicality, and adequacy.  *See* Fed. R. Civ. P. 23(a); *Wal-Mart Stores, Inc. v. Dukes*, — U.S. —, 131 S. Ct. 2541, 2550, 180 L. Ed. 2d 374 (2011).  In addition to satisfying the Rule 23(a) requirements, Plaintiffs must show that the proposed class satisfies one of the three requirements set forth in Rule 23(b).  *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S. Ct. 2231, 138 L. Ed. 3d 689 (1997); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). Where, as here, Plaintiffs seek certification pursuant to Rule 23(b)(3), they must show that "questions of law and fact common to members of the class predominate over questions affecting only individual members of the class" and that the "class action device is superior to other available methods for fairly and efficiently resolving the dispute in question."  *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 808, 814 n.5 (7th Cir. 2012); *see also* Fed. R. Civ. P. 23(b)(3).

In order to grant class certification under Rule 23, the Court must be "satisfied, after a rigorous analysis" that the rule's requirements are met.  *Dukes*, 131 S. Ct. at 2551 (citation

omitted). Because "'[t]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action,'" the court's rigorous analysis frequently "entail[s] some overlap with the merits of the plaintiff's underlying claim." *Id.* at 2551-52 (quoting *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)). Plaintiffs bear the burden of proving each disputed requirement by a preponderance of the evidence. *Messner.*, 669 F.3d at 811. District courts have broad discretion in determining motions for class certification. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 345, 99 S. Ct. 2326, 60 L. Ed. 2d 931 (1979); *Messner*, 669 F.3d at 811.

## ANALYSIS

## I.     The Court Grants Defendants' Motion to Decertify the FLSA Collective Action

Because the parties have completed fact discovery in this case, the Court employs the second, more stringent inquiry into whether this case may proceed as a collective action. *See Medina*, 2012 WL 1094353, at *2 ("After discovery is completed and the opt-in plaintiffs are identified, the more stringent second step occurs."). After reviewing the parties' voluminous submissions, including almost 100 pages of briefing and 200 exhibits, the Court, in its discretion, finds that Plaintiffs in this case are too dissimilarly situated to proceed as a collective action under the FLSA.

### A.     Factual and Employment Settings

To proceed as a collective action, Plaintiffs must "'demonstrate[] similarity among the situations of each plaintiff beyond simply claiming that the FLSA has been violated; an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the overtime laws generally must be present.'" *Russell*, 721 F. Supp. 2d at 812 (quoting *Vennet*

*v. Am. Intercont'l Univ. Online*, No. 05-4889, 2005 WL 6215171, *6 (N.D. Ill. Dec. 22, 2005)).

A collective action is not appropriate when determining whether a plaintiff has a viable claim

requires a detailed, fact-specific inquiry. *See Alvarez*, 605 F.3d at 449. Plaintiffs, however, need

not be identically situated, only similarly situated. *See Russell*, 721 F. Supp. 2d at 812 (citing

cases).

In analyzing Plaintiffs' factual and employment settings, Courts typically consider such

factors as location, job duties, supervision, and policies or practices that bind the plaintiffs'

claims together. *See, e.g., Kuznyetsov v. West Penn Allegheny Health Sys.*, No. 10-948, 2011

WL 6372852, *5 (W.D. Pa. Dec. 20, 2011); *Frye v. Baptist Mem'l Hosp., Inc.*, No. 07-2708,

2010 WL 3862591, *3 (W.D. Tenn. Sept. 27, 2010), *aff'd* 2012 WL 3570657 (6th Cir. Aug. 21,

2012) (unpublished); *Mielke v. Laidlaw Transit, Inc.*, 313 F. Supp. 2d 759, 762-63 (N.D. Ill.

2004). These factors weigh against certification in this case because, as explained in more detail

below, significant factual differences exist among Plaintiffs' employment locations and work

settings, job duties, supervision, and meal break practices. These differences are significant

because determining whether a Plaintiff has a viable claim will require detailed and

individualized factual inquiries, and those individualized issues will predominate over any issues

that are common to the class. *See Alvarez*, 605 F.3d at 449; *see also Reed v. County of Orange*,

266 F.R.D. 446, 450 (C.D. Cal. Jan. 8, 2010) (observing that "[d]ecertification is appropriate

where plaintiffs are subject to varying work conditions in different work locations or under

different supervisors," and where "the disparity between Plaintiffs' factual and employment

settings as to . . . their meal breaks result[ed] in highly individualized questions of fact that

ma[de] proceeding as a collective action impractical and prejudicial to the parties") (citing

10

cases).

The eight Named Plaintiffs and the 209 Opt-In Plaintiffs worked in eight different

hospitals and in 198 different departments within those hospitals during the relevant period.[4]

(R. 187-118, Woods Decl. Ex. B) (citing Plaintiffs' deposition testimony).)  Within those

different departments, Plaintiffs worked different shifts. (*Id.* at Ex. A (citing Plaintiffs'

deposition testimony).)  Plaintiff Barbee, for example, worked 7:00 a.m. to 7:30 p.m. three days

per week, while Plaintiff Moarn worked 11:00 a.m. to 11:30 p.m. three days per week.  (*Id.*)

Plaintiff Moore worked from 11:00 pm. to 7:30 a.m. five days per week.  (*Id.*)

Although Plaintiffs are all nurses, they had varying job duties and work environments,

depending on which particular Defendant employed them and in what department they worked.

*See Reed*, 266 F.R.D. at 450-453 (decertifying an FLSA collective action comprised of Sheriff's

deputies due in part to their differing job duties and work locations, and rejecting the plaintiffs'

argument that they were similarly situated because they worked for the same employer and

engaged in similar law enforcement activities).  This consideration is important to the Court's

analysis, because whether and when Plaintiffs took meal period breaks, and the frequency with

which they took them, depended in large part upon their particular work environment and their

job duties.  *See White v. Baptist Mem'l Health Care Corp.*, No. 08-2478, 2011 WL 1883959, *7

(W.D. Tenn. May 17, 2011) ("Differences in the Opt-in Plaintiffs' job duties are highly relevant

to their claims that they worked during meal breaks without compensation because their job

---

[4]  As explained the factual background section of this Order, each of those hospitals has its own Chief Nursing Officer and Human Resources Director.  Moreover, each hospital, and each department within the hospital, has discretion to implement RHC's policies in way that works best for the particular department.

duties dictated whether and why they experienced missed or interrupted meal breaks.");
*Kuznyetsov*, 2011 WL 6372852, at *5 ("Job duties are highly relevant in terms of how, why and whether the employees were compensated properly for missed or interrupted meal breaks.").

Named Plaintiffs and Opt-In Plaintiffs who work in the orthopedics department at WSMC, the intensive care unit at OLR, and the emergency room at WLH, for example, testified that they received uninterrupted meal breaks on a regular basis. (*See* R. 187-12, Allen Tr. 83:1-12; R. 187-17, Cuevo 61:16-62:16; R. 187-23, Moarn Tr. 85:2-5; 92:1-14 (testifying that he receives uninterrupted meal breaks "[m]ost of the time").) Others who work in the mother-baby and ambulatory care center units at WSMC, however, testified that they occasionally enjoyed uninterrupted meal periods. (*See* R. 187-14, Barbee Tr. 108:6-17 (estimating that out of 12 shifts, she received a full uninterrupted 30-minute meal period during 2 shifts); R. 187-29, Witte Tr. 57:20-24 (testifying that she occasionally received a full uninterrupted 30-minute meal break).) One Opt-In Plaintiff who worked in both the mother-baby unit and the pediatrics unit at OLR testified that she could not recall the frequency with which she received uninterrupted meal breaks. (R. 187-26, Singh Tr. 70:17-22.) These differing accounts demonstrate that differing work environments and job duties impacted the frequency with which Plaintiffs were able to take meal period breaks.

In addition, each department within each Defendant hospital has its own practice regarding whether nurses' meal period breaks are scheduled or unscheduled, and whether nurses may combine unpaid meal periods with paid rest periods. (*See* Woods Decl., Ex. C.) In the surgery unit at HFMC, which is a long-term acute care hospital, for example, staff nurses work with the charge nurse to determine when to take their meal period breaks. (R. 187-25, Fitzgerald

Decl. ¶¶ 6, 12.)  Typically, there are natural breaks for nurses to take their meal periods due to

the patient procedure schedule.  (*Id.* ¶ 12.)  In RMC's Rehabilitation unit and OLR 3 North/3

South telemetry unit, patient procedures and therapies are scheduled in advance, which allows

more structured meal period schedules.  (*See, e.g.*, R. 187-61, Sears Decl. ¶¶ 7, 14.)  Further,

nurses in the surgery unit at HFMC may combine one of their rest breaks with their meal break if

the procedure schedule allows.  (R. 187-25, Fitzgerald Decl. ¶ 11.)  In contrast, in the emergency

departments at SJH and WLH and in WSMC's Family Birthplace unit, meal periods are not

scheduled and the nurses work together to decide when to take their meal periods based on

patient coverage needs.  (R. 187-38, Atlas Decl. ¶ 12; R. 187-59, Saviozzi Decl. ¶ 12; R. 187-48,

James Decl. ¶ 15.)  Nurses in SJH's emergency department frequently combine their paid rest

break with their unpaid meal break.  (R. 187-38, Atlas Decl. ¶ 11.)  This evidence demonstrates

that Defendants did not uniformly implement the meal period policy, but rather allowed each

department to implement it in a way that addressed the particular needs of the department.  *See*

*White*, 2011 WL 1883959, at *1 (decertifying automatic meal deduction collective action where,

in implementing the automatic meal deduction policy, each of the defendants' departments were

"free to formulate . . . procedure[s] that work[ed] best for its employees"); *see also Camesi v.*

*Univ. of Pittsburgh Med. Ctr.*, No. 09-85J, 2011 WL 6372873, *7 (W.D. Pa. Dec. 20, 2011)

(decertifying automatic meal deduction collective action, finding it relevant that "[s]ome

employees would not have a scheduled time for meal breaks and would take them when they

could, other employees had regularly scheduled 30-minute breaks, and others had scheduled

breaks that could not always be followed").

As Plaintiffs concede, Defendants did not have a system-wide policy regarding when Plaintiffs should cancel the automatic meal period deduction. (*See* R. 229, Plaintiffs' Decertification Opp. at 7.) Instead, the practices varied from department to department and fell within the supervisors' discretion.[5] *See Blaney v. Charlotte-Mecklenberg Hosp. Auth.*, No. 10-CV-592, 2011 WL 4351631, *7 (W.D. N.C. Sept. 16, 2011) (denying certification of a FLSA collective action where "Defendant ha[d] established that many of the alleged common policies the Plaintiffs complain of are actually left to the decentralized discretion of the individual units and their exempt and non-exempt management staff."); (R. 187-40, Chillis Decl. ¶ 17 (in OLR's operating room, nurses are instructed to record a "missed or significantly interrupted" meal period and manager approval is not required before recording a missed or interrupted meal period); R. 187-37, Albelo Decl. ¶ 22 (in the emergency department at OLR, nurses are instructed to record a missed meal period if they miss five minutes or more of the 30-minute meal period); R. 187-42, Downer Decl. ¶ 17 (in the critical care department at SFH, nurses are instructed to record a "missed or significantly interrupted" meal period by entering the no lunch punch, and nurses need prior approval from a supervisor before recording a no lunch punch); R. 187-39, Ayanian Decl. ¶ 21 (in the substance abuse unit at HFMC, nurses are instructed to enter a no lunch punch or log missed meal periods in a log book if the nurse "misses any part" of his

---

[5] Plaintiffs contend that they were not given any guidance explaining or instructing when it is appropriate to cancel the automatic meal period deduction. (R. 229, Plaintiffs' Decertification Opp. at 7.) The evidence they cite in support of that proposition, however, demonstrates only that Defendants did not give written instructions on the topic, (*see* R. 179-2, Hinz Tr. 84:1-6), and suggests that employees could speak to their managers, human resources, or their directors if they had any uncertainties as to the appropriateness of canceling the automatic meal period deduction. (*See* R. 179-5, Lambert Tr. 55:15-21; 56:22-57:24; *see also* R. 179-8, Van Dyke Tr. 87:8-89:12.)

or her meal period); R. 187-44, Fitza Decl. ¶ 19 (in the oncology and diabetes department at SMEMC, nurses are instructed to record a "missed or significantly interrupted" meal period by entering a no lunch punch and noting it in a log book; prior manager approval is not required before recording a missed or interrupted meal break); R. 187-118, Woods Decl. Ex. D (citing Declaration testimony).)   In addition, some Plaintiffs devised their own rules for when to record that they missed a meal period.  (*See, e.g.*, R. 187-28, Vardon Tr. 76:18-77:9 (testifying that she would record missed meal period if she was interrupted for more than 10 minutes); R. 187-18, Del Giudice Tr. 66:19-68:4 (testifying that she used her judgment in determining when to record a missed meal period); R. 187-23, Moarn Tr. 84:13-85:1 (testifying that he could record a no lunch punch on days "[w]hen I didn't get a minute to myself").

Wide variances also exist among departments with respect to the way that nurses reported missed meal periods, and whether nurses had to inform their supervisors before recording a missed meal period.  Some departments required nurses to use the API timekeeping system by entering the "no lunch punch," while in others, nurses reported missed meal periods through hard copy timesheets, Post-it notes, log books, email, or verbally.  (*See, e.g.*, R. 179-5, Lambert Tr. 42:1-43:18; R. 179-5, McKinley Tr. 49:17-50:6; R. 179-8, Van Dyke Tr. 85:17-86:2; R. 187-118, Woods Decl. Ex. D (citing Declaration testimony); R. 198-2, Gunnell Tr. 120:15-121:9.)  Opt-In Plaintiffs Cuevo and Thibeault testified that they did not need to obtain a supervisor's approval before recording a missed meal period.  (R. 187-17, Cuevo Tr. 52:7-12; R. 187-27, Thibeault Tr. 65:3-5.)  In contrast, Opt-In Plaintiffs Moore and Witte testified that they had to obtain a supervisor's approval before recording a missed meal period.  (R. 187-24, Moore Tr. 52:3-5; R. 187-29, Witte Tr. 16:10-21.)  These differences weigh against certification.  *See*

*Kuznyetsov,* 2011 WL 6372852, at *5 (finding the fact that supervisors had the authority to

"dictate how and when or if meal breaks were scheduled and the method of reporting a missed

meal break . . . exponentially compounds the differences and individualized experiences that to

go whether there was a violation of the law, rather than creating consistency"); *Blaney*, 2011 WL

4351631, at *7-8 ("[w]hen alleged FLSA violations stem from the enforcement decisions of

individual supervisors, without a company-wide policy or plan direction those enforcement

decisions, collective treatment is not appropriate").

Not only do the facts differ from department to department within Defendant hospitals,

they also differ substantially even within a particular department. Named Plaintiff Camilotes, for

example, recorded a no lunch punch during 8.6% of the shifts that she worked during the

relevant period, but evidence in the record shows that other nurses in the department where she

worked (intensive care unit North) recorded them only an average of 1% of the time. (R. 187-

141, Cohen Report at 9.) Likewise, Named Plaintiff Dobrino, who worked in the emergency

room at WSMC, recorded a no lunch punch during 30.4% of her shifts, while Opt-In Plaintiff

Simmons, who worked in the same department, recorded missed meal periods in 66% of her

shifts. (R. 188-141, Cohen Report at 9; R. 187-118, Woods Decl. ¶ 16.) In contrast, Opt-In

Plaintiff Norris, who also worked in the emergency room at WSMC, reported missed meal

periods in only 0.8% of her shifts. (*Id.*) Yet, the non-Plaintiff nurses who worked in that same

department recorded missed meal periods an average of 16.6% of the time.[6] (*Id.*)

---

[6] Plaintiffs do not argue or present any evidence that Defendants failed to compensate
them for the missed meal periods that Plaintiffs reported.

16

Compounding these differences is the fact that Plaintiffs reported to at least 200 different supervisors during the relevant period.[7] This fact is important because the supervisors had authority to implement meal period procedures in accordance with department needs, and therefore "it is the supervisors who most likely would know if an employee reported a missed meal break." *See Kuznyetsov*, 2011 WL 6372852, at *5; (R. 187-11, Van Dyke Tr. 21:3-25:8; R. 187-1, Brown Tr. 18:17-19:5; R. 179-3, Skiem Tr. Ex. 3 at SMEMC 008158 ("Your manager will assign you a meal period and advise you of the meal period policy for your particular shift.").)

Plaintiffs unpersuasively argue that these factual differences are "minor" and do not warrant decertification. They argue that they have sufficiently demonstrated that Plaintiffs are similarly situated because of (1) "Defendants' system-wide failure to relieve nurses of their work so they can enjoy thirty minute meal breaks"; (2) "Defendants failure to train Plaintiffs on when and how they should report they failed to receive a thirty minute meal break"; and (3) "the failure to pay nurses for all of the overtime hours they worked due to Resurrection's practice of automatically deducting thirty minutes from each shift worked." (R. 229, Plaintiffs' Decertification Opp. at 21.) Contrary to their assertions, however, Plaintiffs have *not* met their burden of establishing that the at-issue practices do not "vary from unit to unit or supervisor to supervisor." (*See id.*)

---

[7] Moreover, in some departments, supervisory responsibilities, including those regarding organizing meal period breaks, are delegated to charge nurses and team leaders. (*See* R. 187-37, Albelo Decl. ¶¶ 10-11 (Emergency Department at OLR); R. 187-39, Ayanian Decl. ¶¶ 5, 9 (Substance Abuse Unit at HFMC); R. 187-42, Downer Decl. ¶ 7 (Critical Care Department at SFH); R 187-45, Fitzgerald Decl. ¶ 8 (Surgical Services unit at HFMC); R. 187-46, G. Garcia Decl. ¶¶ 3, 6 (Intensive Care Unit at SJH).)

17

Plaintiffs have not established that Defendants had a system-wide practice of failing to relieve nurses of their work so that they could receive thirty minute meal breaks. Indeed, Defendants have submitted evidence, including testimony from Opt-In Plaintiffs, demonstrating that departments use varying mechanisms to relieve nurses from duty so that they can take their meal breaks. (*See, e.g.*, R. 187-17, Cuevo Tr. 67:4-68:6; R. 187-76, Christian Decl. ¶ 9;[8] R. 187-18, Gepolio Decl. ¶ 8; R. 187-106, Plucinski Decl. ¶ 10.) Moreover, as explained above, several Opt-In Plaintiffs testified that they regularly received uninterrupted thirty-minute meal breaks, while others in different departments testified that they only received them occasionally. This evidence indicates that Defendants' practice was not uniform system-wide.

Plaintiffs' second alleged system-wide practice is contradicted by the evidence in the record, discussed above, which demonstrates that Defendants' training and instructions to nurse employees as to when it was appropriate to report a missed meal period varied from department to department and was not uniform system-wide. *See Blaney*, 2011 WL 4351631, at *8 (denying certification of a FLSA collective action where "[t]he responsibility of training employees regarding meal-breaks and how to account for their time when interrupted ultimately fell to unit-level management). Several Named Plaintiffs testified that they knew how to indicate that they had not received a meal period, whether by entering a "no lunch punch" or otherwise. (*See* R. 179-10, Camilotes Tr. 44:7-21; R. 179-11, Fify Tr. 65:4-11 (testifying that she learned from a

---

[8] Plaintiffs argue that the Court should not credit non-Plaintiff declarations because the declarants felt pressured to sign the declarations for their employer. The Court, however, has previously rejected this assertion (*see* R. 167, Jan. 25, 2011 Order at 10-14), and Plaintiffs have not set forth any new evidence indicating that non-Plaintiff nurses felt pressured to sign declarations, despite having the contact information for all of the declarants. The Court will therefore consider the non-Plaintiff declarations to the extent they are relevant.

meeting with her manager that punching Code 5 indicates no lunch); R 179-9, Barbee Tr. 54:2-4 (testifying that if she missed her lunch, she would tell her charge nurse); R. 179-13, Vardon Tr. 52:9-53:1; R. 179-12, Moarn Tr. 79:14-80:12 (testifying that he would either punch the "no lunch code" or inform his supervisor verbally if he forgot to punch the code); R. 179-11, Dobrino Tr. 37:4-23; 85:13-170).  This evidence suggests that Defendants' training practices were not uniform system wide.

Plaintiffs' third alleged system-wide practice fares no better.  To the extent Plaintiffs assert that a collective action is appropriate due to Defendants' common policy of automatically deducting 30 minutes from employees' shifts, their argument fails because an automatic deduction policy, in and of itself, does not violate the FLSA.  *See* Wage and Hour Div., U.S. Dep't of Labor Fact Sheet No. 53, The Health Care Industry and Hours Worked (July 2009); *see also Frye*, 2012 WL 3570657 at *3; *McClean v. Health Sys.*, No. 11-03037-CV, 2012 U.S. Dist. LEXIS 22874, at *15 (W.D. Mo. Feb. 23, 2012); *White*, 2011 WL 1883959 at *8; *Zivali v. AT&T Mobility, LLC*, 784 F. Supp.2d 456, 462-63 (S.D.N.Y. 2011); *Blaney*, 2011 WL 4351631 at *6; *Wolman v. Catholic Health Sys. of Long Island, Inc*., No. 10-CV-1326, 2011 WL 1741905, *1 (E.D.N.Y. May 5, 2011); *Cason v. Vibra Healthcare*, No. 10-10642, 2011 WL 1659381, *3 (E.D. Mich. May 3, 2011).  As such, that policy cannot, without more, bind Plaintiffs together for purposes of the "similarly situated" inquiry, especially given the myriad of significant factual differences explained above.  *See Frye*, 2012 WL 3570657 at *5 ("[A]n automatic-deduction policy by itself comports with the FLSA (*see* DOL Fact Sheet No. 53 at 3), and thus cannot serve as the lone point of similarity supporting class certification."); *White*, 2011 WL 1883959 at *8 (the defendant's "mere adoption of a system that, by default, deducts meal breaks from its

employees' compensation does not constitute a unified policy of FLSA violations capable of

binding together the Opt-in Plaintiffs"); *Camesi*, 2011 WL 6372873 at *5 (the defendant's

"implementation of an automatic deduction policy does not, in and of itself, warrant final

certification"); *Manning v. Boston Med. Ctr. Corp.*, No. 09-11463, 2012 WL 1355673, at *3

(D. Mass. Apr. 18, 2012) (same) (citing *White*, 2011 WL 1883959 at *10).[9]

      Although Plaintiffs argue that Defendants' implementation of the automatic deduction

policy caused FLSA violations, Plaintiffs have not demonstrated that Defendants'

implementation of the policy was uniform system-wide. Indeed, the evidence shows the

opposite–specifically, that Defendants delegated authority to department managers within each

hospital to determine how to implement Defendants' policies, including developing department-

specific procedures related to the automatic deduction policy. (*See* R. 187-31, Bajgrowicz Decl.

¶ 17; R. 187-32, Edwards Decl. ¶ 15; R. 187-33, Lambert Decl. ¶ 16; R. 187-34, Miserendino

Decl. ¶ 15; R. 187-35, Richard Decl. ¶ 17.) In particular, managers implemented policies and

practices to address how to schedule meal periods, where employees may take their meal

---

[9] Although Plaintiffs need not, at the certification stage, prove that Defendants employed a policy that *in fact* violates the FLSA, *see Russell*, 721 F. Supp. 2d at 814-15, whether Plaintiffs can prove the existence of a common policy that potentially violates the FLSA is nonetheless relevant. *See id.* (observing that while "some courts require plaintiffs to show that they are similarly situated by identifying a company-wide policy or practice that violates the FLSA, others do not require a shared policy or plan where 'a collective action would promote judicial economy because there is otherwise an identifiable factual or legal nexus.'") (internal citations omitted); *see also Frye*, 2012 WL 3570657 at *5 ("The absence of a common theory of FLSA violation, though not fatal to certification . . . , weighs against certification here because of the dissimilarities in plaintiffs' work experiences."); *Camesi*, 2011 WL 6372873 at *3-4 (rejecting the plaintiffs' argument that the Court should focus on the defendant's common policies of making automatic deductions where employees received more than twenty minutes of uninterrupted meal breaks, finding that such common policies did not override the many dissimilarities between plaintiffs).

periods, how employees are relieved from duty for their meal periods, whether employees may take assigned cell phones or pagers with them on their meal periods, whether supervisory permission is required to take a meal period, and how employees record time worked. (*Id.*) Other courts have decertified an FLSA class based on similar facts. *See, e.g., Kuznyetsov*, 2011 WL 6372852 at *5 ("[W]hile it is true that there is a Meal Break Deduction Policy and all employees were subject to an automatic deduction that could be cancelled, the application and implementation of the policy was not standard by any means. It differed based on a number of factors, not the least of which was based on the nature of the jobs performed by Plaintiffs, the departments in which the plaintiffs worked, the supervisors' procedures, and the shifts Plaintiffs worked."); *White*, 2011 WL 1883959 at *9 ("There must be a showing that 'enforcement of the automatic deduction policy created a policy-to-violate-the-policy.'") (quoting *Saleen v. Waste Mgmt., Inc.*, No. 08-4959, 2009 WL 1664451, at *4 (D. Minn. June 15, 2009)); *Frye*, 2010 WL 3862591 at *5 (same); *see also Blaney*, 2011 WL 4351631, at *7 (conditional certification of FLSA collective action was inappropriate where the defendant had "established that many of the alleged common policies that Plaintiffs complain of are actually left to the decentralized discretion of the individual units and their exempt and non-exempt management staff").

A number of courts have decertified FLSA collective actions in cases involving automatic meal deduction policies that are similar to the one at issue in this case. *See, e.g., Kuznyetsov*, 2011 WL 6372852; *Camesi*, 2011 WL 6372873; *White*, 2011 WL 1883959; *Frye*, 2010 WL 3862591, *aff'd* 2012 WL 3570657; *see also Blaney*, 2011 WL 4351631 (denying

certification). These cases, while not controlling, are persuasive. Plaintiffs' attempt to distinguish these cases on the grounds that the proposed classes in those cases were comprised of several different types of hospital employees, including persons who performed administrative and housekeeping duties, is not persuasive. (*See* R. 229, Plaintiffs' Decertification Opp. at 20.) That fact does not appear to be dispositive in any of those cases. Moreover, even though the proposed class in this case is comprised of all nurses, Defendants have established significant factual differences among the departments with respect to when nurses are able to take their meal breaks and under what circumstances, as explained above. *See also Blaney*, 2011 WL 4351631, at *1 (denying the plaintiffs' motion to certify a collective action comprised of nurse and nurse assistants); *see also Reed*, 266 F.R.D. at 450-53 (decertifying FLSA class of Sheriff's deputies where locations and job duties differed); *Lawrence v. City of Philadelphia*, No. 03-CV-4009, 2004 WL 945139, *2 (E.D. Pa. Apr. 29, 2004) (finding that plaintiffs, all fire service paramedics with the City Fire Department's Emergency Medical Services Unit with the same general job description, were not similarly situated with respect to FLSA "off-the-clock" claim because they worked in "different unit types, different platoons, different locations, and [had] different supervisors").

## B. Individualized Defenses

The second factor, the defenses available to Defendants, also weighs in favor of decertification. In analyzing this factor, the Court considers "whether defendants' defenses could be applied across the board to [P]laintiffs' claims and potential [P]laintiffs' claims or whether many and perhaps disparate defenses could be raised." *Russell*, 721 F. Supp. 2d at 821. As the court in *Kuznetsov* stated,

> [t]he defense as to each Plaintiff would require consideration of different facts and individualized testimony that is unique to each Plaintiff and could not be generalized among the . . . Plaintiffs.  For example, it will be necessary to consider whether each Plaintiff had knowledge of the cancellation policy and how to cancel an automatic deduction, whether they worked through a meal break, whether Defendants had knowledge that Plaintiff worked through the meal break, whether the meal break deduction was cancelled, how it was cancelled, whether that Plaintiff was compensated for the time, [and] if not, whether Defendants had knowledge that Plaintiff was not properly compensated.

*Kuznyetsov*, 2011 WL 6372852, at *6 (finding that individualized defenses weighed in favor of decertification where "Defendants ha[d] produced evidence that the individual supervisors had discretion with regard to whether a meal break was missed and how a meal break deduction would be cancelled."); *see also Camesi*, 2011 WL 6372873, at *9 (finding that the individuality of defenses favored decertification where defenses included whether the defendant's management had actual or constructive knowledge of any off-duty work performed, whether individual opt-ins were exempt from the FLSA during the relevant time period, and whether individual plaintiffs worked overtime without compensation). In this case, determining whether Defendants had actual or constructive knowledge of Plaintiffs' work during meal periods and whether named Plaintiffs and Opt-In Plaintiffs actually worked overtime without receiving compensation will require individualized inquiries.

Specifically, determining whether Defendants had actual knowledge would require, at a minimum, proof specific to each hospital, and probably to each Plaintiff.  As outlined above, the Plaintiffs worked in eight different hospitals and in 198 different departments within those hospitals.  Within those different departments, they also worked different shifts and reported to over 200 different supervisors.  Additionally, the departments differed in terms of how and whether nurses would notify anyone when they took their meal breaks, with some departments

not requiring nurses to notify anyone. (*See e.g.*, R. 187-14, Barbee 64:19-65:1; R. 187-20, Fify 48:10-50:3; R. 187-25, Pawlowski 57:21-24; R. 187-23, Moarn 109:13-110:6; R. 187-25, Pawlowski 58:5-18; R. 187-26, Singh 56:8-14; R. 187-27, Thibeault 63:3-6; R. 187-28, Vardon 57:20-58:10, 63:5-15; R. 187-29, Witte 45:16-23; R. 187-30, Wyatt 68:11-15; R. 187- 37, Albelo Decl. ¶¶15-16; R. 187-50, Kindle Decl. ¶ 10; R. 187-55, Pojas Decl. ¶ 14; R. 187-58, Romani Decl. ¶ 13)  As a result, determining what supervisors may have been aware of nurses working through meals without compensation will require a fact-specific inquiry based on the specific working conditions each Plaintiff encountered.  Establishing constructive knowledge also will require an individualized inquiry, despite Plaintiff's contention that a comparison of the National Database of Nursing Quality Indicators ("NDNQI") survey results and statistics on the use of the "no lunch punch" procedure establishes this point.  (R. 178, Plaintiffs' Class Cert. Mot. at 10-14) Even assuming, *arguendo*, that Plaintiffs' conclusion that the NDNQI results show that between 60% and 90% of nurses did not have an uninterrupted meal period is correct, there is no indication that the Opt-In Plaintiffs had a comparable experience to the large group of self-selected nurses surveyed by the NDNQI.  Evidence representative of the specific experiences of the Plaintiffs will be necessary to establish the Defendants' constructive knowledge.

Plaintiffs argue that Defendants' defenses do not require individualized inquires because they "will not be raised against specific Plaintiffs; rather they 'will be asserted against every member of the class.'"  (R. 229, Plaintiffs' Decert. Opp. at 29 (quoting *Crawford v. Lexington-Fayette Urban Cty. Gov't*, No. 06-299, 2008 WL 2885230 (E.D. Ky. July 22, 2008).)  According to Plaintiffs, Defendants will be able to assert their defenses on a class-wide basis in response to representative testimony on behalf of the class.  (*Id.*)  As discussed above, however, the plethora

of factual differences surrounding Plaintiffs' meal period practices and experiences, combined with Plaintiffs' failure to show that Plaintiffs were subject to a common policy or practice that potentially violated the FLSA, makes it impossible for Plaintiffs to prove their claims by common proof. Instead, each Plaintiff's claim will require individualized inquiries, as will Defendants' defense to each particular Plaintiff's claim. As such, Plaintiffs' reliance on the adequacy of asserting defenses in response to representative testimony is unconvincing. *See Kuznyetsov*, 2011 WL 6372852, at \*6 (finding that "the defenses available to Defendants for one Plaintiff's claims cannot serve as a proxy for the defenses available with regarding to another Plaintiff's claims" where implementation of the automatic deduction cancellation process was not uniform as to all Plaintiffs).

The case law on which Plaintiffs rely is unhelpful, because in each case the court had determined that the plaintiffs could prove their claims through common evidence by showing that they were subject to a common policy or practice that potentially violated the FLSA. *See Crawford*, 2008 WL 2885230, at \*9 (finding that the plaintiffs had presented "substantial evidence supporting their contention that the defendant's *de facto* policies and practices deprived them of a bona fide meal period" such that "there is a meaningful nexus that binds plaintiffs' claims together"); *Russell*, 721 F. Supp. 2d at 815-16 (finding that the plaintiffs were subject to common policies); *Andrako v. U.S. Steel Corp.*, 788 F. Supp. 2d 372, 382 (W.D. Pa. 2011) (finding "that the differences in plaintiffs' factual and employment settings do not outweigh the above similarities or the commonality of the allegedly unlawful policy to which Plaintiffs claim to have been subjected"). Indeed, the court in *Kuznyetsov*, which also decided *Andrako*, distinguished *Andrako* for that very reason. *Kuznyetsov*, 2011 WL 6372852, at \*7

(distinguishing *Andrako* on the grounds that it involved a common unlawful policy and that the defendant's defenses related to damages rather than liability). Plaintiffs have not shown that Defendants' defenses could be applied across the board to Plaintiffs' claims, and therefore this factor weighs against certification.

### C. Fairness and Procedural Concerns

Due to the myriad of individualized factual issues this case presents, the third factor in the collective action analysis also weighs in favor of decertification. *See White*, 2011 WL 1883959 at *14 ("Because [the plaintiff] has not shown that the Opt-in Plaintiffs are similarly situated . . ., there is no judicial economy to be gained by allowing their claims to proceed collectively. The only possible results are unfairness to [the defendant] and manageability problems for the Court.") While Plaintiffs' desire to litigate collectively for economic reasons is understandable, it does not override the negative effects that certification is very likely to have on the fairness and manageability of the proceedings. *See Camesi*, 2011 WL 6372873 at *9 (explaining that the court could not view the plaintiffs' desire to litigate collectively as the "only consideration," but must "balance the reduced litigation costs to individual Plaintiffs with the potential effects that final certification may have on the fairness of the adjudication and the interests of manageability and judicial efficiency") (citing *White*, 2011 WL 1883959 at *13)).

The Seventh Circuit instructed in *Alvarez v. City of Chicago* that "if it appears plaintiffs are prepared to proceed individually or through separate classes, the district court must consider whether these other mechanisms for judicial resolution of their claims are more or less efficient than a collective action comprised of various subclaims." *Alvarez*, 605 F.3d at 450. Although Plaintiffs contend that "numerous mechanisms are available to this Court at trial to allay any

fairness or procedural concerns," they fail to propose any specific trial plan, nor do they propose any specific potential subclasses. Generically stating that unspecified mechanisms may exist is not sufficient to allay the Court's manageability and fairness concerns, especially given the plethora of individualized factual issues in this case. *See Camesi*, 2011 WL 6372873 at *9 ("Although Plaintiffs' counsel generally suggest that the various individualized inquiries could be handled through representative testimony, bifurcation or subclassification, they offer no meaningful explanations of how this could be accomplished.") (citing *White,* 2011 WL 1883959 at *14 ("[i]f representative testimony that would resolve the fairness and manageability issues in this litigation were readily available, the Court would expect [the plaintiff] to rely on that testimony to support her argument[s]")).

Moreover, given the vast factual differences among Plaintiffs' work settings and meal period experiences, it would be impractical and unfair for this case to proceed as a collective action. As one district court addressing FLSA claims based on non-payment of worked meal periods stated:

> As is no doubt evident, the [plaintiffs'] experiences concerning their meal breaks are diverse. In truth, whether Plaintiffs missed a meal break and reported it varies from assignment to assignment and from [plaintiff] to [plaintiff]. Attempting to generalize a [plaintiff's] experience using a representative sample would be a highly inaccurate method of determining the validity of Plaintiffs' claims. It is senseless to proceed as a collective action when Plaintiffs' experiences regarding missed meals vary from day to day, and from individual to individual. Even more troubling is that [the defendant] will not have an opportunity to meaningfully cross examine opt-in Plaintiffs concerning their meal breaks, which will produce unfairness on both sides.

*Reed*, 266 F.R.D. at 458. In short, Plaintiffs' "representative" testimony in this case would not, in fact, be representative of the class as a whole because of the myriad of factual differences surrounding whether, when, and under what circumstances Plaintiffs took meal breaks and

reported missed meal breaks.

## II.    The Court Denies Plaintiffs' Motion to Certify Under Rule 23

Plaintiffs seek to certify the following class under Rule 23:

> All persons employed by any of the Defendants as a nurse since October 26,
> 2006, who were subject to Resurrection Health Care Corporation's automatic
> thirty-minute meal period deduction from hours worked, which resulted in them
> not being paid all overtime compensation for house worked in excess of forty
> hours in a work week.

(Pls.' Class Cert. Mem. at 22.)  For largely the same reasons that Plaintiffs' FLSA claim does not

warrant collective treatment, Plaintiffs' IMWL claim is also inappropriate for class certification

under Rule 23.  Specifically, Plaintiffs have not met their burden of showing that common

questions of law and fact predominate over individualized factual inquiries under Rule 23(b)(3),

nor have they established that the case is manageable as a class action.

As the Seventh Circuit recently stated, "[t]here is no mathematical or mechanical test for

evaluating predominance."  *Messner*, 669 F.3d at 814 (citing 7AA Wright & Miller, Federal

Practice & Procedure ("Wright & Miller") § 1778 (3d ed. 2011)).  The predominance "'inquiry

trains on the legal or factual questions that qualify each class member's case as a genuine

controversy,' with the purpose being to determine whether a proposed class is 'sufficiently

cohesive to warrant adjudication by representation.'"  *Id.* at 814 (quoting *Amchem*, 521 U.S. at

623).  The predominance requirement "is satisfied 'when common questions represent a

significant aspect of [a] case and . . . can be resolved for all members of [a] class in a single

adjudication.'"  *Id.* at 815 (citing Wright & Miller § 1778)).  Plaintiffs must show that it is

possible to use common evidence to prove that Defendants' conduct injured the members of the

proposed class.  *Id.*  To be clear, Plaintiffs burden on class certification is not to prove the

element of injury, but rather to demonstrate that such element is "*capable of proof at trial through evidence that is common to the class rather than individual to its members.*" *Messner*, 669 F.3d at 818 (quoting *Behrend v. Comcast Corp.*, 655 F.3d 182, 197 (3d. Cir. 2011) (emphasis in original).

The Court looks to the elements underlying Plaintiffs' IMWL claim to determine whether common issues of law and fact predominate over individualized issues. *See Messner*, 669 F.3d at 815 ("Analysis of predominance under Rule 23(b)(3) 'begins, of course, with the elements of the underlying cause of action.'") (quoting *Erica P. John Fun, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184, 180 L. Ed. 2d 24 (2011)). As Plaintiffs concede, the elements of their IMWL claim are the same as their FLSA claim, since the IMWL claim incorporates the FLSA regulations by reference. (R. 178, Plaintiffs' Class Cert. Mot. at 17); *see also Condo v. Sysco Corp.*, 1 F.3d 599, 601 n.3 (7th Cir. 1993). Plaintiffs further acknowledge that Rule 23(b)(3)'s predominance requirement is more stringent than the "similarly situated" requirement under § 216(b). (R. 229, Plaintiffs' Decertification Opp. at 14) (citing *Rodolico v. Unisys. Corp.*, 199 F.R.D. 468, 481 (E.D.N.Y. 2001)); *see also O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 584 (6th Cir. 2009); *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996). Because Plaintiffs have failed to meet their burden to show that they are "similarly situated" for purposes of § 216(b), they have also failed to demonstrate, by a preponderance of the evidence, that common issues predominate over individual issues for their IMWL claim under Rule 23(b). *See McClean*, 2012 U.S. Dist. LEXIS 22874, at *15-16 (plaintiffs did not satisfy Rule 23(b)(3) where implementation of the Defendants' automatic break deduction policy varied from facility to facility). As explained above, Plaintiffs will not be able to prove their claims using evidence that

is common to the class–rather, individualized inquiries into the facts surrounding each Plaintiff's meal period experiences will be required. *See Messner*, 669 F.3d at 818 (a plaintiff's burden on class certification is to demonstrate that the elements of its claim are "capable of proof at trial through evidence that is common to the class rather than individual to its members").

In addition, the fairness and procedural concerns that the Court explained above with respect to the § 216(b) analysis also render class treatment of Plaintiffs' IMWL claim unmanageable and thus not appropriate for certification under Rule 23(b). *See* Fed. R. Civ. P. 23(b)(3) (providing that matters pertinent to the Court's Rule 23(b)(3) analysis include "the likely difficulties in managing a class action").

## CONCLUSION

For the reasons set forth above, the Court grants Defendants' motion to decertify the FLSA collective action, and denies Plaintiffs' motion to certify their IMWL claim under Rule 23.

**DATED: October 4, 2012**          **ENTERED**

_____
**AMY J. ST. EVE**
**United States District Court Judge**